In re WES DOR, INCORPORATED, also known as N.M.L., Incorporated, doing business as Lumber Yard Supply, Debtor.

H. Christopher CLARK, Trustee,
Plaintiff–Appellee,

v.

SECURITY PACIFIC BUSINESS CREDIT, INC., Defendant–Appellant,

and

H. Carter Espedal; Crown Industries, Inc.; April Eighty–Four Corp.; and Crown Door of Colorado, Defendants.

No. 92–1228.

United States Court of Appeals,
Tenth Circuit.

June 18, 1993.

---

Paul G. Quinn (Charles F. Kaiser with him on the briefs), Denver, CO, for plaintiff-appellee.

Christopher L. Richardson (Thomas C. Bell with him on the briefs), Davis, Graham & Stubbs, Denver, CO, for defendant-appellant.

Before LOGAN, MCWILLIAMS, and MOORE, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

This is an appeal in a bankruptcy adversary proceeding. Defendant Security Pacific Business Credit, Inc. (Bank), a pre-bankruptcy lender to the Debtor, Wes Dor, Inc., and its affiliates, appeals a bankruptcy court order, affirmed by the district court, permitting Debtor's Trustee to recover the bulk of a fraudulent transfer made to the Bank. The bankruptcy court, however, allowed the Bank to set off, as an innocent transferee, a portion of the funds it received. On appeal, the Bank contends as an innocent party it was entitled to retain the entire amount of the transfer. In support of that basic position, the Bank raises issues pertaining to the value it extended to Debtor as part of the transfer and whether the bankruptcy and district courts appreciated the concept of that value. Finding no error, we affirm.

At the genesis of this case, the Bank was a lender to West Coast Dor, Inc. (WCD), the parent corporation of the Debtor. WCD had two wholly-owned subsidiaries, Debtor and Southwest Dor, Inc. (SWD). H. Carter Espedal was the president and corporate principal of WCD and its subsidiaries.

In 1983 and 1985, the Bank and the parent, WCD, entered into loan arrangements, personally guaranteed by Mr. Espedal, in which the Bank agreed to finance WCD's business operations.[1] Because WCD was a holding

---

1. Specifically, in mid–1983, WCD executed a $250,000 Secured Promissory Note payable to the Bank, a Loan and Security Agreement providing a $3,750,000 line of credit, and a Fixed

company that conducted business through its subsidiaries, the loan proceeds were transferred to the subsidiaries through intercompany loans carried on the parent's books as accounts receivable. The subsidiaries then used the funds to pay their operating costs and repaid the loans by depositing proceeds from their receivables into a lock box controlled by the Bank. In turn, the Bank applied the lock box funds to the advances it made to the parent.

Although the subsidiaries were not parties to the written loan agreements, it was understood by all parties the only assets available to the Bank as security for its loans were owned by the subsidiaries, and WCD's only asset of value was the stock of the Debtor and its sister company. In apparent recognition of that understanding, the subsidiaries gave the Bank financing statements in its favor, but no security agreements were executed in support of those financing statements.

■ This arrangement persisted until October 1985, when employees of the Bank circulated an internal memo discussing the potential problems created by obtaining financing statements without the backing of security agreements executed by the purported Debtor.[2] However, because WCD sought additional financing at the time, the Bank decided not to request documentation from the subsidiaries.[3] Thus, the Bank continued lending money to WCD despite knowledge it did not have separate documentation from the subsidiaries upon which to enforce a security interest in their assets.

In July 1986, a Bank internal memo was circulated indicating the Bank's concern that Debtor was operating at a substantial loss. The Bank also received a memo from its attorney stating that WCD's loans were not properly secured, and the Bank should do something about the problem. Consequently, in early August 1986, the Bank informed Mr. Espedal that if he wanted additional financing he would have to sign an Addendum to the written loan agreements pledging the subsidiaries' assets as collateral for WCD's outstanding loans.[4]

On August 5, 1986, when WCD's outstanding obligation to the Bank stood at $3,761,052, Mr. Espedal executed the Addendum on the subsidiaries' behalf. This "August 5 transfer" forms the basis of the parties' dispute. The bankruptcy court found that at this time Debtor's assets exceeded the amount of the obligation it assumed; therefore, the court concluded the value of Debtor's assets transferred to secure the Bank's loans was the amount of the obligation or $3,761,052.

In late November, Debtor sold all its assets except accounts receivable to Crown Industries, Inc. The proceeds of the sale and the subsequent collection of the lock box funds paid from Debtor's accounts receivable permitted the Bank to recover the full amount of its loan balance. The bankruptcy court found but for the August 5 transfer, all of Debtor's unsecured creditors would have been paid pro rata, and the Bank would not have received full recovery.

In a manner not relevant to this appeal, Debtor found its way into liquidating bankruptcy, and Trustee was appointed to marshal its assets. As part of that process, Trustee subsequently filed this adversary

Assets Loan Rider Supplement to [the] Loan and Security Agreement. In November 1985, WCD signed a second Secured Promissory Note for $400,000 and an Amendment to Loan and Security Agreement.

2. In the absence of a valid security agreement, a financing statement does not create an enforceable security interest. *Cf. Transport Equip. Co. v. Guaranty State Bank*, 518 F.2d 377, 380 (10th Cir.1975).

3. A contemporaneous Bank internal memo stated: "If we are to request the customer to re-document the loan and run the loan to the individual subsidiaries, we may end losing the account."

4. The bankruptcy court found that in doing so the Bank acted with "the hammer in the velvet glove a little bit here." Not only did the Bank know "it had a wholly unsecured loan on which there was a significant amount of money outstanding," but "the principals of Wes Dor knew they had a problem because if they didn't cooperate a little bit, Security Pacific might pull the plug on the whole thing and then Mr. Espedal was going to be in a lot of trouble" because of his outstanding personal guarantees on the loans.

proceeding seeking to recover the $3,761,052 received by the Bank through the enforcement of the Addendum executed on August 5.

Although Trustee prosecuted alternatively under 11 U.S.C. § 547 to recover a preferential transfer and 11 U.S.C. § 548(a)(1) to recover a fraudulent transfer,[5] the bankruptcy court concluded Trustee was entitled to recover only under § 548(a)(1).[6] In that context, the court properly concluded the Bank's intent in formulating the transfer was irrelevant because the focus under § 548(a)(1) is on the motives of the debtor, not the obligee. On the basis of the evidence, then, the court found Debtor "clearly" desired to prefer the Bank over other creditors.

Recognizing preferential intent alone was insufficient to invoke § 548(a)(1), the court identified additional evidence of an actual intent to defraud. The court pointed to the desires of Mr. Espedal, who had executed his personal guarantee of the WCD debt to the Bank backed by his own property given as security. Mr. Espedal had no similar liability to the Debtor's trade creditors. Additionally, the court noted, in the sale to Crown Industries Mr. Espedal did not disclose Debtor's execution of the financing statement in favor of the Bank. Indeed, the list of creditors furnished to Crown Industries in compliance with the Colorado bulk sales law did not even list the Bank as one of Debtor's creditors. When Crown Industries discovered the outstanding financing statement, Mr. Espedal not only denied the existence of any obligation to the Bank, but also gave Crown Industries the loan documents between the Bank and Debtor's parent WCD, and said that was the only existing obligation. The court found Mr. Espedal's intent in this charade was to "avoid creating unnecessary unrest with the trade creditors so that the transactions with Security Pacific would go unnoticed and the sale could be closed, and the dollars utilized to pay Security Pacific." Based on these findings, the court concluded "Mr. Espedal, on his own behalf and on behalf of his corporations, entered into the August transaction, made the transfer, committed the assets of Wes Dor to the payment of the Security Pacific debt with the actual intent to hinder or delay or defraud the creditors of Wes Dor."

Finally, the court addressed the Bank's contention that, as a good faith creditor who gave equal value in exchange for the transfer, under § 548(c) [7] it was protected against Trustee's action. The court determined that although Trustee conceded the Bank gave value to the extent of $958,093, the intercompany debt traceable to the Bank financing on the day of the transfer, the value of the property transferred to the Bank was at least equal to the debt owed by WCD. Thus, Trustee was entitled to recover the difference between the value of the property transferred and the value given by the Bank. Consequently, the court awarded Trustee the amount of the August 5 transfer, $3,761,052, less $958,093, set off in accordance with § 548(c).

On initial appeal from the bankruptcy court, the district court considered three issues: whether Debtor was indebted to the Bank before the August 5 transfer; whether the Bank gave equivalent value for the transfer; and whether there was sufficient evidence of an actual intent to defraud on the part of Debtor. After reviewing each of the bankruptcy court's findings, the district court concluded:

> the date that such ... obligation was incurred, indebted.

---

**5.** Under 11 U.S.C. § 550(a)(1), the trustee may recover from the transferee the value of property delivered by fraudulent or preferential transfers.

**6.** Section 548(a)(1) provides:

> The trustee may avoid any ... obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition if the debtor voluntarily or involuntarily—
> (1) ... incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after

**7.** Section 548(c) reads:

> Except to the extent that [an] ... obligation voidable under this section is voidable under section 544, 545, or 547 of this title, [an] obligee of such ... [an] obligation that takes for value and in good faith has a lien on ... any interest transferred or may enforce any obligation incurred, ... to the extent that such ... obligee gave value to the debtor in exchange for such ... obligation.

I think these were difficult calls and there were a lot of disputed facts; but in looking at the disputed facts, not only can I find no determinations of fact that were clearly erroneous, but I would probably have found the same way myself, had I been confronted with the facts.... [I]t does not appear to me that there are any findings of fact that were clearly erroneous, nor any conclusions of law that are in error.

On appeal to this court, the Bank re-urges its fundamental position that despite the Debtor's intent, the Bank was an innocent creditor who extended value of at least $3,761,052 to the Debtor in exchange for the execution of the Addendum. Because of its innocence and the value it gave, the Bank should be entitled to the entire amount under § 548(c). To support this contention, the Bank submits several points.

The Bank first contends the district court erroneously reviewed the bankruptcy court's finding of the extent of Debtor's "indebtedness" under a clearly erroneous standard. "Rather than analyzing the facts within the framework of the Bankruptcy Code, including 11 U.S.C. § 548(c)," the Bank claims the district court "summarily affirmed the Bankruptcy Court's ill-founded conclusion that SPBC gave value to WDI in an amount of ... the intercompany debt between WDI and WCD on August 5, 1986." According to the Bank, this court is "duty bound to independently apply these findings of fact to the appropriate legal precepts to determine the ultimate legal issue, *i.e.*, what was the value given to WDI by SPBC in exchange for the August 5, 1986 transfer."

In response, Trustee contends the Bank has changed its contentions on appeal and raised issues not presented to the district court. He submits the Bank argued in the bankruptcy court that Debtor was not "legally obligated" to the Bank prior to August 5, 1986, and that its claim for recovery was founded upon equitable principles. Trustee further urges that at trial the Bank took the position that its only claim was for the unpaid advances from the Bank to Debtor. Now Trustee argues this court should not allow the Bank to expand its appeal beyond

the remedy it sought at trial, citing *Savage v. McNeany,* 372 F.2d 199 (10th Cir.1967).

Because we do not have the complete record before us, the competing arguments of what issues were raised and what issues were not are as clear as an enigma bathed in a dim gray light. It is documented, however, that the Bank took the position in its brief in support of its motion for summary judgment in the bankruptcy court that Debtor "was not legally obligated to SPBC under its loan agreements prior to August 5, 1986." Notwithstanding, the bankruptcy court found that a debtor-creditor relationship existed between Debtor and the Bank on the day of transfer. There is no indication in the record Trustee objected to that finding or otherwise claimed the issue was not in controversy when the finding was made. Accordingly, despite the seeming mystery over subtly changing positions, we believe the issue of the pre-August 5 relationship is before us.

## I.

■ "In reviewing a bankruptcy court decision we apply the same standards of review as those governing appellate review in other cases." *In re Perma Pacific Properties,* 983 F.2d 964, 966 (10th Cir.1992) (citation omitted). Accordingly, "we review the bankruptcy court's legal determinations *de novo,* and its factual findings under the clearly erroneous standard." *Id.* (quoting *In re Davidovich,* 901 F.2d 1533, 1536 (10th Cir. 1990)). Moreover, "[o]n the mixed question of whether the facts satisfy the proper legal standard, we conduct a *de novo* review if the question primarily involves the consideration of legal principles and apply the clearly erroneous standard if the question is primarily a factual inquiry." *Uselton v. Commercial Lovelace Motor Freight, Inc.,* 940 F.2d 564, 572 (10th Cir.) (citation omitted), *cert. denied,* —— U.S. ——, 112 S.Ct. 589, 116 L.Ed.2d 614 (1991).

We note initially, although the Bank admits the bankruptcy court's factual findings can only be set aside if clearly erroneous, it nonetheless attempts to characterize certain factual issues as "legal" to invoke a heightened standard of review. Moreover, the

242

Bank contends the district court only applied the clearly erroneous standard, when in fact the court reviewed the bankruptcy court's factual findings *and* legal conclusions, finding no error under either standard of review.

■ Although this court has not yet had the opportunity to address the standard of review for § 548(c) determinations, at least one authority has noted: "[w]hether the transfer is for 'reasonably equivalent value' [under § 548(a)(2) ] in every case is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts." 4 *Collier on Bankruptcy* ¶ 548.09, at 548–112 (15th ed.1993). It follows that the determination of "value" under § 548(c) necessitates the same level of deference afforded to § 548(a)(2) findings. We shall apply that standard.

## II.

The Bank next contends it should have been allowed to retain the entire amount of the August 5 transfer pursuant to 11 U.S.C. § 548(c). Because it "was a creditor of WDI for the full amount" owed under the loan documents before the transfer, the Bank maintains "[a]s a matter of law, WDI received 'value' to the extent of no less than $3,761,052, the outstanding obligation owed to SPBC on August 5, 1986." Thus, "even if the Bankruptcy Court correctly found WDI transferred the security interest to SPBC with actual fraudulent intent," the Bank claims it is entitled to retain that amount under 11 U.S.C. § 548(c) as "the good faith recipient (for value) of the transfer."

To support its position, the Bank notes that antecedent debt constitutes "value" for the granting of a security interest under 11 U.S.C. § 548(d)(2)(A). The Bank then argues that because antecedent debt is broadly construed under the Bankruptcy Code to encompass all legal and equitable rights to payment, it had a claim against Debtor on August 5, 1986, for at least $3,761,052 since its claim was enforceable under "various [state law] legal and equitable claims," including implied-in-fact contract and unjust enrichment. Thus, the Bank maintains its "right to payment from WDI for obligations owing under the Loan Documents, whether founded on implied contract, quasi-contract or unjust enrichment, was within the scope of 'antecedent debt,' as contemplated by § 548."

The Bank claims the parties' course of conduct and expressed intent mandate a finding that Debtor already was liable for the total outstanding balance due on WCD's loans *before the transfer occurred.* Thus, because the Addendum merely memorialized Debtor's "antecedent debt," the transfer was given for value and should be upheld in its entirety.

In response, Trustee maintains because the assets of affiliated corporations are not treated as a common pool in the absence of unusual circumstances, and here there are no unusual circumstances, the Bank only gave value for the August 5 transfer in the amount of the funds it had received but were unpaid on that date. Moreover, Trustee reminds, Debtor had no direct obligations to the Bank before the transfer, and the Bank failed to prove at trial the existence of an implied-in-fact contract. Trustee adds, no evidence was produced indicating Mr. Espedal acted on Debtor's behalf in entering into the 1983 and 1985 loan agreements.

Because the parties do not dispute the bankruptcy court's finding that Mr. Espedal and Debtor executed the Addendum with an actual intent to defraud its unsecured trade creditors, the only issue before us is the extent to which the Bank gave "value" for the transfer and, hence, may retain proceeds under § 548(c). Essential to our analysis is the extent to which the Debtor was obligated to the Bank at the time of the transfer because under § 548(d)(2)(A) "value" includes the securing of an antecedent debt of the debtor.

Quite helpful in resolving the issue of the extent of the Debtor's obligation to the Bank is *In re Xonics Photochemical, Inc.,* 841 F.2d 198 (7th Cir.1988), in which the court considered the issue of contingent liabilities and inter-affiliate obligations in the context of preferential transfers. The court first noted the "obvious danger" when a parent corporation "causes one of its subsidiaries to guarantee another's (or the parent's own) debts," observing:

there is no automatic "piercing of the corporate veil" in affiliation settings. The assets of the affiliated corporations are not treated as a common pool available to the creditors of each affiliate unless unusual circumstances are present that would make it inequitable to allow the other affiliates to set up the principle of limited liability, the clearest such circumstance being that the creditors of all the affiliates had thought they were dealing with a unitary system.

*Id.* at 201. However, because the affiliates voluntarily pooled their assets, the court ultimately held that "a guarantee of an affiliate's debt is enforceable provided that the guarantor derives some benefit, even if indirect, from the guarantee." *Id.* (citation omitted). This result is proper because "[t]he benefit operates as a partial offset to the impairment in the prospects of the guarantor's creditors resulting from the debtor's assuming a contingent liability." *Id.*

■ The corollary to this principle is that a subsidiary can only be held liable for an unperfected guaranty of the debt of a parent corporation to the extent the subsidiary has received a benefit. Moreover, that conclusion would apply whether the unperfected guaranty arises from an implied contract or assumptions based upon the conduct of the parties.

■ This conclusion undercuts the Bank's contention it gave *Debtor* value for the August 5 Addendum in the entire amount of its transfers. Although Debtor was a partial beneficiary of the financial relationship between the Bank and WCD, the benefits it had received by August 5 did not equal the amount of funds extended by the Bank to the parent. Indeed, Debtor directly benefited only to the extent of the $958,093 in intercorporate debt it had actually received and owed to its parent on August 5. Although its sister affiliate, SWD, had received the benefit

of $2,509,028, Debtor did not share in those funds.

In apparent recognition of this problem, the Bank contends it gave, but the district court failed to recognize, indirect value in excess of the funding. To the extent indirect benefits could be considered, a matter we do not decide,[8] the Bank fails to point to any evidence quantifying the amount of such benefits. While it argues such things as "substantial benefits through the duration of the lending relationship," continuing advances, "indirect benefits associated with the ongoing viability of WCD and SWD," and the ability obtained through the advancement of funds to sell its business to Crown Industries, the Bank does not point to any evidence in the record quantifying the value of those inherent benefits to the Debtor. Thus, without indulging in speculation, we cannot say either the district or bankruptcy courts erred in their analysis of the value given by the Bank.[9]

We are satisfied the bankruptcy and district courts correctly resolved the Bank was the transferee of a fraudulent transfer from the Debtor. As such, it became liable to the bankruptcy estate for the amount of the transfer less any value it extended to the Debtor in exchange for that transfer. Because the only evidence of that value is the amount by which the Debtor benefited from loans extended to its parent, that is all the Bank can set off against the Trustee. Consequently, the judgment of the district court is **AFFIRMED.**

---

8. Indeed, because the Bankruptcy Code's definition of "value" expressly excludes "an unperformed promise to furnish support to the debtor," it is questionable whether the Bank's promise of future funding would constitute consideration for purposes of this court's § 548(c) determination. *See* § 548(d)(2)(A).

9. Again, in evident recognition of the state of the record, the Bank requests that we remand for the purpose of "assess[ing] the value received by WDI." The time for such assessment, however, was at trial. The Bank's failure to obtain a full record does not entitle it to a second try.