In re Paul Lloyd NEWMAN, Myrtle Gladys Newman, Debtors.

J. Michael MORRIS, Plaintiff,

v.

MIDWAY SOUTHERN BAPTIST CHURCH, Defendant.

Bankruptcy No. 94–10233.
Adv. No. 94–5126.

United States Bankruptcy Court, D. Kansas.

April 20, 1995.

J. Michael Morris, Trustee, Klenda, Mitchell, Austerman & Zuercher, Wichita, KS.

Edgar W. Dwire, Malone, Dwire & Jones, Wichita, KS, for defendant.

Janet Reno, U.S. Atty. Gen., Washington, DC.

Randall K. Rathbun, U.S. Atty., D. Kansas, Wichita, KS.

### MEMORANDUM OF OPINION GRANTING COMPLAINT TO RECOVER FRAUDULENT TRANSFER

JOHN K. PEARSON, Bankruptcy Judge.

This adversary was tried to the Court on January 24, 1995. The trustee appeared by J. Michael Morris of Klenda, Mitchell, Austerman & Zuercher, Wichita, Kansas. The defendant, Midway Southern Baptist Church (the "defendant" or the "church") appeared by Edgar W. Dwire of Malone, Dwire & Jones, Wichita, Kansas.

### JURISDICTION

The Court has jurisdiction over this proceeding. 28 U.S.C. § 1334. This is a core proceeding. 28 U.S.C. § 157(b)(2)(H).

### NATURE OF THE CASE

The trustee has sued the church under 11 U.S.C. § 548 to recover $2,442.22 the debtors

paid to it in the year preceding their petition for relief under Chapter 7. The church generally concedes the facts, but argues that the trustee's action is a discriminatory restriction on the *debtors'* free exercise of religion, and that recovery is barred *a fortiori* under the Religious Freedom Restoration Act. Pub.L. No. 103–141, 107 Stat. 1488 (codified as amended at 42 U.S.C. §§ 1988(a), 2000bb to 2000bb–4; 5 U.S.C. § 504(b) (1993)). For the reasons discussed below, the Court holds that the trustee is entitled to recover $2,442.22.

### FACTS

Based on the evidence presented and the stipulations of the parties, the Court makes the following findings of fact:

1. This bankruptcy case was filed by the debtors on February 3, 1994.

2. Within one year before the date of the filing of their petition, the debtors transferred to the church a total of $2,457.72.[1]

3. The debtors were insolvent at the time of all of the transfers.

4. The debtors made the following payments to the church within one year of filing their petition:

| Date | Amount | Purpose |
|---|---|---|
| January 3, 1993 | $176.00 | "Tithe and Mission" |
| February 3, 1993 | 5.50 | "Dinner" |
| February 7, 1993 | 171.00 | "Tithe and Mission" |
| February 28, 1993 | 10.00 | "Hymnals" |
| March 7, 1993 | 171.00 | No purpose stated |
| April 1, 1993 | 171.00 | "Tithe and Mission" |
| May 1, 1993 | 171.00 | "Tithe and Mission" |
| June 1, 1993 | 171.00 | "Tithe and Mission" |
| July 3, 1993 | 171.00 | "Tithe and Mission" |
| July 21, 1993 | 183.22 | "Tithe and Mission" |
| August 1, 1993 | 171.00 | "Tithe and Mission" |
| [2]November 7, 1993 | 177.00 | "Tithe and Mission" |
| December 3, 1993 | 177.00 | "Tithe and Mission" |
| January 1, 1993 | 177.00 | "Tithe and Mission" |
| February 1, 1994 | 177.00 | "Tithe and Mission" |

5. The debtors have a sincere and firmly held belief in tithing. They had no *fraudulent* intent in making their payments to the church.

6. The practice of tithing, which originates in the Bible,[3] requires that religious persons give one-tenth of their gross income[4] to their place of worship. The debtors' actual contributions exceeded ten percent of their income.

7. The debtors transferred $2,457.72[5] to the defendant in the year preceding the filing of their bankruptcy petition. The debtors received less than reasonably equivalent value in exchange for the payments of $2,442.22. The debtors' transfers of $5.50 for "meals" and $10.00 for "hymnals" were in return for reasonably equivalent value. That would account for the difference between the amount transferred and the amount claimed by the trustee.

8. The church is not a mere conduit for the donations made by the debtors. The church exercises considerable discretion in which of its ministries it will fund on a month-to-month basis and funds its fixed expenses before paying over funds collected from the parishioners to other church-affiliated groups.

9. While the church's constitution and by-laws require a member to tithe, no member has ever been expelled from the church for nonpayment of the tithe. No effort is made by the minister of the church to determine whether a member is meeting his or her obligation to tithe.

---

1. The stipulation indicates that the money paid to the church was "donations;" at trial the church introduced evidence that some of the total was for meals and for specific purposes. While the trustee objected, the Court accepts the church's characterization that some of the money paid over was for specific purposes.

2. Notations in the exhibit (the checks) attached to the Newmans' deposition, state: "Sept 1993 is missing $177.00" and "Oct 3 1993 is missing 177.00."

3. The textual basis of the obligation to tithe is not entirely clear. The court in *In re Packham*, 126

B.R. 603 (Bankr.D.Utah 1991) traced the origin to a passage in Malachi 3:8–12; the church in this case traces it to Genesis 28:22. It would appear that the tithe is a return of benefits received.

4. Apparently even the authors of the Bible understood the problems inherent in computing net income.

5. This amount omits the January 3, 1993 transfer, which occurred more than one year prior to the debtors filing their bankruptcy petition, but includes the September 1993 and October 1993 transfers.

10. The debtors are in their 70s, in poor health and eke out a difficult existence on an income of $1,556 per month. The debtors' schedule J, Current Expenditures of Individual Debtors, shows current monthly expenses of $2,458, including debt service payments and $177 per month to the church. The debtors own a mobile home, a car, and their clothing and household goods. The 1991 car is subject to a lien securing a debt of $9,000. The schedules indicate that the debtors have unsecured debts of $16,365, consisting primarily of credit card and medical debts.

11. The debtors have received considerable support and assistance from the church and its members in the last few years in the form of counselling, car and housing repairs, groceries, and transportation. However, the church was unable to document any actual expenditures for the groceries, repairs, or other tangible assistance furnished to the debtors.

### CONCLUSIONS OF LAW

The Court reaches the following conclusions of law:

12. To defeat a fraudulent transfer action, any value received in exchange for a transfer made within one year preceding the filing of a petition for relief, must have actual or monetary value or provide some form of economic benefit to the debtor. Value which might constitute legal consideration for a binding contract is insufficient.

13. All elements of a fraudulent transfer under 11 U.S.C. § 548(a)(2) have been met as to $2,442.22 of the debtors' payments to the church. The trustee did not seek to recover $15.50 of the funds the debtors transferred to the defendant. The debtors received reasonably equivalent value for that $15.50.

14. Public policy does not except charitable gifts to religious groups from recovery under 11 U.S.C. § 548.

15. The provisions of 11 U.S.C. § 548(a)(2) are neutral on their face and any effect that they may have on religious practice is merely incidental.

16. The provisions of 11 U.S.C. § 548(a)(2) do not constitute a substantial burden on the free exercise of religion.

17. 11 U.S.C. § 548(a)(2) is narrowly drawn and serves a compelling governmental interest.

### DISCUSSION

Commercial and religious law have coexisted for at least as long as humans have attempted to write down either. Bankruptcy itself (or at least debt forgiveness) may have its origin in practices codified by King Hamurabi [6] and the early Jewish custom of the Jubilee Year. Much of the European and English bankruptcy law can trace its origin to medieval Jewish commercial and bankruptcy law which was administered by a rabbinical court. The bankruptcy court is a court of equity and thus a direct descendant of the ecclesiastic courts of England.

Most of the commercial and bankruptcy law in the United States is drawn from English sources. As England moved from a farming to a trading economy, it recognized the need for a body of commercial law. Increased trade meant increased trade failures, and beginning with Edward III in the mid-1300s, various laws were passed regulating the collection of debts and winding up the assets of failed traders.

One of the first efforts was to provide for a prorata distribution of the debtor's estate to all creditors rather than allowing some creditors to be paid in full by levying on local assets. The first English statutes specifically relating to bankruptcy, enacted during the reign of Henry VIII in 1542 and 1543, dealt directly with the distribution of the debtor's estate. (34 & 35 Henry VIII, c. 4). According to Holdsworth (citing Lord Coke) "The intent ... was to relieve the creditors of the bankruptcy equally, and that there should be an equal rateable portion observed in the distribution of the bankrupt's goods amongst

---

6. The Court is in possession of a manuscript thesis by Joseph Pomykala, a Ph.D. candidate at the University of Pennsylvania, which among other things tracks much of the history of bankruptcy in the United States and Europe. Many of the Court's comments are drawn from that source.

the creditors, having regard to the quantity of their debts,...." Bankruptcy was commercial remedy, and a bankruptcy proceeding commenced only against "traders." Prior to that time, creditors were paid in order of attachment, which resulted in some being paid in full and most getting little or nothing. The recovery of fraudulent and preferential transfers became a central tenet of the bankruptcy laws throughout the development process. In 1570, 13 Eliz. I c. 5, entitled an "Act against Conveyances to Defraud Creditors," made certain *fraudulent* and preferential transfers voidable.[7] Pomykala convincingly traces how, in the next two hundred years, the English Parliament continued to tinker with the bankruptcy (and insolvency) laws, in response to some flagrant abuse of the system or financial panic, depression, or disaster (*e.g.* the infamous South Sea Bubble of 1720). That pattern continued in this country. The Bankruptcy Act of 1898 was a delayed response to the Panic of 1893 and the 1938 amendments a direct response to the Great Depression.

At the time that the United States won its independence from England, the existing English bankruptcy and insolvency laws applied in most of the colonies, although some of the colonial legislatures had adopted local laws. One of the difficulties facing a merchant doing business across colonial or national boundaries at that time was the colonial tendency to prefer local creditors over foreign creditors. In some colonies and, later, states, local creditors were preferred over creditors from neighboring colonies and creditors from neighboring colonies preferred over creditors from England.[8] The common law, however, included the fraudulent transfer provisions dating from the 1570s. While the United States managed to survive most

of the 19th Century without a Bankruptcy Law, recovery of "fraudulent" transfers has been a basic feature of all bankruptcy laws passed, and most states have fraudulent transfer laws.

The history of fraudulent conveyance laws is particularly relevant to this case. The present form of 11 U.S.C. § 548 has its origin in § 67(d) of the old Bankruptcy Act of 1898. Section 67 of the Bankruptcy Act, in its original form, was styled after the "Act against Conveyances to Defraud Creditors" of 13 Elizabeth. *See* 4 Lawrence P. King, *Collier on Bankruptcy* ¶ 548.01 (15th ed. 1994) and *supra* note 6.

### *"Fraudulent" Transfers under* *11 U.S.C. § 548(a)(2)*

■ The Church objects strenuously to the "fraudulent" label placed on the transfers the trustee seeks to recover. It asserts, correctly, that no fraudulent intent has been shown. The "fraudulent" label is inapposite,[9] but the intent of the statute remains clear: No fraud is required to recover transfers made gratuitously on the eve of bankruptcy. No one is accusing the debtors or the church of any improper behavior. At issue is a policy decision made some 400 years ago that certain transfers prior to bankruptcy are subject to recovery for the benefit of all creditors *without any evidence of fraud.*

■ In pertinent part, 11 U.S.C. § 548(a) allows that a trustee in bankruptcy:

> may avoid any transfer of an interest of the debtor in property ... that was made ... on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

> . . . . .

---

**7.** 13 Eliz. I c. 5, 1570. Apparently, the number of bankruptcy filings has climbed every year since. The preamble to the Act provided: "Forasmuch as, not withstanding the statute made in the thirty-eighth year of our late sovereign lord King Henry the Eight, those kinds of persons have and do still increase into greater and excessive numbers...." Commercial law and religious practice remained intertwined, although early bankrupts were subject to imprisonment, a bankrupt might seek sanctuary in certain abbeys and avoid imprisonment. It would ap-

pear that bankruptcy laws antecede the free exercise of religion in Western Europe.

**8.** In a way, the preference rules paralleled the old Arab proverb: "My brother and I against my cousin; my cousin and I against the world."

**9.** While § 548(a)(1) requires actual intent to defraud, (a)(2) deals with "constructive fraud." A transfer is constructively fraudulent if an insolvent debtor transfers some of its property for less than reasonably equivalent value.

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the day the transfer was made ... or became insolvent as a result of such transfer....

11 U.S.C. § 548(a). In order to prevail under § 548(a)(2), the trustee must show the following:

(1) A transfer of an interest of the debtor in property occurred;

(2) The transfer occurred within one year of the bankruptcy filing;

(3) The debtor received less than equivalent value in exchange for the transfer; and

(4) The debtor was insolvent on the date of the transfer.

*In re Investment Bankers, Inc.,* 136 B.R. 1008, 1021 (D.Colo.1989), *aff'd,* 4 F.3d 1556 (10th Cir.1993), *cert. denied sub nom., Davis, Gillenwater & Lynch v. Turner,* — U.S. ——, 114 S.Ct. 1061, 127 L.Ed.2d 381 (1994). The trustee has the burden of proving the above elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 285–87, 111 S.Ct. 654, 658–60, 112 L.Ed.2d 755 (1991); *In re Chase & Sanborn Corp.,* 904 F.2d 588, 593–94 (11th Cir.1990).

■ In this case, the parties have already stipulated that the transfers in question involved interests of the debtors in property, occurred within one year of the debtors' bankruptcy filing, and that the debtors were insolvent on the dates of the various transfers. The case, therefore, hinges on the third factor, whether the debtors received less than reasonably equivalent value in exchange for the transfer.

The debtors' firmly held belief in their religious obligation to tithe was not disputed at trial. The defendant, both at trial and in its brief, literally quoted chapter and verse from the Bible establishing the religious prescription of tithing. The long standing interpretations of several verses generally support both the tithing requirement and the ten percent figure. The debtors obviously took this requirement very seriously, giving the defendant slightly more than ten percent of their annual gross (and fixed) income, even in the face of their own growing financial problems. The religious practice of tithing is not an issue.

However, for § 548(a)(2) purposes, the focus is on whether the debtors received reasonably equivalent value in exchange for their transfers to the defendant. The inquiry, then, is two-part. First, the Court must determine whether the debtors received "reasonably equivalent" value, and second, whether the value was received *in exchange for* the transfer. As discussed below, the Court concludes that the debtors did not receive anything *in exchange* for their tithe and that the religious comfort and support does not constitute value under the Bankruptcy Code.

The term "value" as used in § 548 means "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or the relative of the debtor." 11 U.S.C. § 548(d)(2)(A). The funds advanced by the debtors to the defendant were not done to satisfy or secure an antecedent debt.[10]

■ "Reasonably equivalent" value in bankruptcy has long meant tangible benefit or economic value. § 548(d)(2)(A). "[W]hether the transfer is for 'reasonably equivalent value' [under § 548(a)(2) ] in every case is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts." *Clark v. Security Pacific Business Credit, Inc. (In re Wes Dor, Inc.),* 996 F.2d 237, 242 (10th Cir.1993) (quoting 4 *Collier on Bankruptcy* ¶ 548.09, at 548–112 (15th ed. 1993)). Certainly, reasonably equivalent value does not require a dollar for dollar matching. *Butler Aviation Internat'l, Inc. v. Whyte (Matter of Fairchild Aviation Corp.),* 6 F.3d 1119, 1125–26 (5th Cir.1993). "[T]he recognized test is whether the [transfer] conferred any *economic* benefit on the

---

**10.** The defendant made some vague references to the debt that the debtors owed to God. However, any such obligation is beyond the jurisdiction of this Court to determine. Assuming the debtors feel so obligated, the obligation does not constitute a debt as that term is used in the Bankruptcy Code.

debtor...." *Id.* at 1127 (emphasis added, citations omitted); *see Wes Dor, supra* at 243. However, "the requirement of economic benefit to the debtor does not demand consideration that replaces the transferred property with something else tangible or leviable that can be sold to satisfy the debtor's creditor's claims." 2 David G. Epstein, et al., *Bankruptcy,* § 6–49, at 23 (1992).

This case is the factual twin of *Christians v. Crystal Evangelical Free Church (In re Young),* 152 B.R. 939 (D.Minn.1993). In *Young,* the husband and wife debtors had tithed regularly to their church in the year immediately prior to their bankruptcy filing. Their bankruptcy trustee sought to recover those funds as fraudulent conveyances. The parties in that case, as in this case, had stipulated to all of the elements of a fraudulent conveyance except the issue of whether the debtors received reasonably equivalent value in exchange for their transfer. In *Young,* as in this case, the debtors had a firm belief in their obligation to tithe and did so out of a sense of religious obligation. The court found that the debtors did not receive any property right in exchange for their tithes and that transfers "made out of a sense of moral obligation rather than legal obligation" cannot be for reasonably equivalent value. *See id.* at 948.

■ The Court agrees with the *Young* court's analysis. In this case, the debtors undoubtedly possessed a long-held belief in their religious obligation to tithe. The debtors in this case, like those in *Young,* stated that they tithed as a means of fulfilling this religious obligation. Fulfilling that obligation, however, does not amount to reasonably equivalent value. *See id.* (citing *Whitlock v. Hause (In re Hause),* 13 B.R. 75, 79 (Bankr.D.Mass.1981); *see also Walker v. Treadwell (Matter of Treadwell),* 699 F.2d 1050 (11th Cir.1983) (transfer of $4,000 from a father to his daughters in exchange for their love and affection was not reasonably equivalent value). Further, the debtors' tithes did not give them an enforceable property right to attend or partake in services offered by the defendant. If the defendant had excluded the debtors from its services, the debtors would not have been able to sue

on based on contract principles or even on equitable grounds such as unjust enrichment. As stated previously, the transfer must result in some economic benefit flowing back to the debtor. Such economic benefit is clearly lacking in this case.

The *Young* court looked to the Supreme Court's ruling in *Hernandez v. C.I.R.,* 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766, *reh'g denied,* 492 U.S. 933, 110 S.Ct. 16, 106 L.Ed.2d 630 (1989) for guidance on value. The *Hernandez* case dealt with the Internal Revenue Service's (IRS) disallowance of a tax deduction for certain transfers made to the Church of Scientology. In that case, the taxpayer was a member of the Church of Scientology. As a primary tenet of that religion, members were to conduct certain one-on-one counseling sessions, called audits. Members were charged fixed prices for these sessions, and they could not attend the sessions if they could not pay the fees. The fees, known as "fixed donations," "fixed contributions," or "price," were prepaid by the members. Any unused portion was refundable. The Supreme Court ruled that only gratuitous contributions were tax deductible; any *quid pro quo* rendered a contribution nondeductible. *Id.* at 690–94, 109 S.Ct. at 2144–46.

The defendant, while arguing on the one hand that the debtors received value for their contributions to it, would certainly argue just as vigorously that the transfers were gratuitous if the IRS would suddenly cease allowing its members to deduct their contributions from their gross income. Granted, in this case it is doubtful that the debtors took advantage of the tax deduction, given their relatively low fixed income. However, the logic still holds.

Additionally, this Court cannot attempt to put a value on the services and intangible support offered by the defendant. The spiritual value that each of the members of the defendant receives may not be accurately reflected by the amount of their tithe. A person who makes $100,000 a year and tithes ten percent may or may not receive more spiritual value than a person who makes the same amount, but does not tithe at all. Nor could it be said that by increasing the

amount of the tithe beyond ten percent would yield a corresponding increase in spiritual value. It is impossible to put a dollar value on such a benefit.

■ Even if the Court were to determine that the debtors received value, the support was not "in exchange for" the tithe. The debtors attended defendant's worship services, received emotional support and counseling from defendant's staff, and accepted other services offered by the defendant. Indeed, the defendant's members were very supportive of the debtors, on at least one occasion paying their utility bill, performing minor repairs on the debtors' home and automobile,[11] and providing occasional transportation to church services. Mr. Walter Emery, pastor of the defendant church, testified to the services provided by the church to the debtors. However, Mr. Emery also stated that it was *not* his practice to make sure that the debtors had tithed before such services were provided, nor did he have any knowledge at the time the services had been provided whether the debtors had tithed at all.

Mr. Emery stated that the defendant's constitution and bylaws set forth the requirement, both directly and indirectly, that its members tithe. It was also his testimony that, to the best of his knowledge, only one person had been removed from the defendant's congregation for failing to tithe since he had been pastor. On cross-examination, however, Mr. Emery made clear that the person's failure to tithe was not the reason for their dismissal, nor was it the practice of the defendant to remove members for failing to tithe. Additionally, Mr. Emery stated that there were undoubtedly members of the defendant's congregation who did not tithe who still attended church.

Given the sincerity of the debtors' religious convictions, it appears that they would have tithed the same amount even if the defendant were to have cut back on its services. The debtors did not say that they tithed in order to have the defendant's members come out and perform repairs on their home, or fix their car, or pay their utility bills, but rather as a fulfillment of their religious obligation. Also, given the testimony of Mr. Emery, it is doubtful that the defendant would have turned its back on the debtors if they had cut back on their tithe or ceased altogether. It is clear to the Court that the debtors did not tithe in exchange for the defendant's services.

The payments to the church are fraudulent transfers recoverable under § 548(a)(2).

### Constitutional Questions

Defendant next contends that it would be a violation of the First Amendment's Free Exercise Clause for the Court to order it to return the tithes to the trustee.[12] In addition to the blanket free exercise argument, the defendant also argues that it is entitled to prevail *a fortiori* under the Religious Freedom Restoration Act (RFRA). Before addressing these issues, the Court must consider the defendant's standing to raise the constitutional challenges based on the debtors' rights.

### The Defendant Has Standing to Assert the Debtors' Constitutional Rights

■ The defendant asserts the debtors' constitutional rights to freedom of religion. The debtors, while they are the subject of the bankruptcy case, are not parties in interest in this adversary proceeding. The Court must, therefore, determine whether the defendant has standing to raise the con-

---

11. On this matter, it was not clear at trial whether the persons who provided the labor were acting individually or as agents of the defendant, or whether the defendant had purchased the materials used. However, it is clear that it was the debtors' affiliation with the defendant that facilitated the repairs.

12. Where the constitutionality of a federal statute is in issue and the United States is not a party, the Court is required to certify that fact to the Attorney General. 28 U.S.C. § 2403(a). This,

however, is not a jurisdictional prerequisite. *See Tonya K. by Diane K. v. Board of Education,* 847 F.2d 1243 (7th Cir.1988); *Wallach v. Lieberman,* 366 F.2d 254 (2d Cir.1966). In this case, because the Court is upholding the constitutionality of the statute in question, it is doubtful that the Attorney General will seek to intervene. Nevertheless, the Court will direct that a copy of this opinion be sent to the Attorney General who may intervene by appealing this decision. *See In re Melvin,* 13 B.R. 96 (Bankr.S.D.Fla.1981).

stitutional challenge. While the trustee did not directly attack standing, standing is a jurisdictional prerequisite, and the Court can raise such issues *sua sponte*. *See Juidice v. Vail,* 430 U.S. 327, 331–32, 97 S.Ct. 1211, 1215–16, 51 L.Ed.2d 376 (1977); *Regents of University of California v. Bakke,* 438 U.S. 265, 281 n. 14, 98 S.Ct. 2733, 2743 n. 14, 57 L.Ed.2d 750 (1978).

■ Standing has been defined as "the determination of whether a specific person is the proper party to bring a particular matter to the Court for adjudication." Erwin Chemerinsky, *Federal Jurisdiction* § 2.3, at 48 (1989). The need for standing is derived from the "case or controversy" requirement of Article III of the Constitution. Generally, standing is limited to the person who has suffered the injury or wrong in question. *See Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). However, in some limited instances, courts have allowed third parties to raise the constitutional rights of the person who has suffered the wrong. This is known as the third party standing doctrine.

■ The third party standing doctrine is very limited. A third party has standing where "(1) the relationship between the [litigant] and the third party is such that the [litigant] is nearly as effective a proponent of the of the third party's right as the third party itself, and (2) there is some obstacle to the third party asserting the right." *Knight v. Alabama,* 14 F.3d 1534, 1554 (11th Cir. 1994) (citing *Singleton v. Wulff,* 428 U.S. 106, 114–16, 96 S.Ct. 2868, 2874–75, 49 L.Ed.2d 826 (1976); *see Young, supra* at 951 (citing *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), for the proposition that a litigant asserting the free exercise rights of a third party may do so if the third party cannot effectively assert those rights). This narrow exception applies in this case. Here, the interests of the defendant and the debtors are sufficiently close that the defendant, as a proponent of those rights, is just as effective as the debtors. Further, the debtors are not parties to this action and their financial condition is such that they are unable to assert their rights. Therefore, that the defendant has standing to assert the debtors' constitutional rights.

### The Free Exercise Clause

■ The defendant in this case attacks 11 U.S.C. § 548(a)(2) as violating the First Amendment because it unfairly discriminates against those religions that require tithing as one of their tenets and also against members of those religions who tithe.

■ The Free Exercise Clause of the First Amendment provides that "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. Const. amend. I. It forbids the government from adopting laws designed to suppress religious belief or practice. *Church of Lukumi Babalu Aye, Inc. v. Hialeah,* —— U.S. ——, ——, 113 S.Ct. 2217, 2222, 124 L.Ed.2d 472 (1993). In general, a law does not offend the Free Exercise Clause if it is neutral and generally applicable, even if it has an *incidental* effect on religious practice. *Employment Div., Dept. of Human Resources v. Smith,* 494 U.S. 872, 878–79, 110 S.Ct. 1595, 1599–1600, 108 L.Ed.2d 876 (1990).

The Supreme Court recently restated the tests for determining whether a statute impermissibly burdens religious practice. In *Church of Lukumi Babalu Aye,* the Supreme Court reviewed Hialeah, Florida ordinances clearly designed to suppress the practice of the Santeria religion. These ordinances prohibited ritual animal slaughter, a central part of the Santeria religion, within the city limits. The ordinances carefully prohibited only animal *sacrifice* and the possession of animals for sacrificial purposes. There was no like prohibition for hunting, fishing, or the killing of animals for food. The Supreme Court deemed the ordinances an impermissible a "religious gerrymander" because they singled out specific religious practices for discriminatory treatment. The Supreme Court subjected the ordinances to strict scrutiny, the same level of scrutiny it applies to content-based restrictions on speech, *Church of Lukumi Babalu Aye,* —— U.S. ——––——, 113 S.Ct. at 2233–34, and held the ordinances unconstitutional. While this case is clearly

distinguishable from *Church of Lukumi Babalu Aye,* the court's neutrality test is applicable.

Justice Kennedy began by noting that "[a]t a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct *because it is undertaken for religious reasons."* *Id.* at ——, 113 S.Ct. at 2226 (emphasis added, citations omitted). The key is to discern the object of the statute. *Id.* at ——, 113 S.Ct. at 2227. When determining whether the object of a statute is neutral one begins with the text. *Id.* "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id.*

The analysis, however, does not end with the language of the statute. The Free Exercise Clause is also concerned with "subtle departures from neutrality and covert suppression of particular religious beliefs." *Id.* (citations omitted). The Court, therefore, must also look at the "effect of the law in its real application [as] strong evidence of its object." *Id.* at ——, 113 S.Ct. at 2228.

In this case, 11 U.S.C. § 548(a) allows the case trustee to recover *any* transfer which meets its criteria, not because the transfer was religiously motivated or the result of following a religious practice. Section 548 makes no reference whatsoever to religious practice. It is neutral on its face: It is not directed at religious practice. While the law may, as this case demonstrates, affect religious practice, any effect is purely incidental to the general bankruptcy practice of equal distribution to creditors. *See Employment Div., Dept. of Human Resources,* 494 U.S. at 878–79, 110 S.Ct. at 1599–1600. On its face, the object of the statute is neutral towards religion.

Unlike the ordinances at issue in *Church of Lukumi Babalu Aye,* which embodied a thinly veiled attempt to *prohibit* a specific practice of a particular religion, the operation of § 548(a) is not directed at any religious practice or at any religion, nor does it prohibit any activity. Rather, under the statute, it does not matter to whom the transfer was made; as long as it occurred within one year of the bankruptcy filing, while the debtor was insolvent, and was for less than reasonably equivalent value, the transfer is recoverable by the trustee. 11 U.S.C. § 548(a)(2). The fact that a transfer meeting the criteria of § 548(a)(2) was made pursuant to a religious belief or practice is merely incidental to the operation of the statute. Section 548(a)(2) is therefore a generally applicable law, neutral toward religion both in its object and its operation, does not have more than an incidental effect on religion, and therefore does not offend the First Amendment's Free Exercise Clause. *See Employment Div., Dept. of Human Resources,* 494 U.S. at 878–79, 110 S.Ct. at 1599–1600; *see also Christians v. Crystal Evangelical Free Church (In re Young),* 152 B.R. 939 (D.Minn.1993).

### Religious Freedom Restoration Act

The defendant also argues that the recently enacted Religious Freedom Restoration Act (RFRA) bars the trustee from recovering the transfers made by the debtors. Pub.L. No. 103–141, 107 Stat. 1488 (codified as amended at 42 U.S.C. §§ 1988(a), 2000bb to 2000bb–4; 5 U.S.C. § 504(b) (1993)). RFRA mandates that government shall not "substantially burden a person's exercise of religion" unless the government demonstrates that the burden furthers a "compelling governmental interest" by the "least restrictive means." 42 U.S.C. § 2000bb–1. Congress passed RFRA as a response to the Supreme Court's decision in *Employment Division, Department of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).[13] *See* 42 U.S.C. § 2000bb (finding that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise"). RFRA provides that it is to be applied to all federal and state laws whether they were adopted before or after

---

13. The Western District of Texas has recently held RFRA to be an unconstitutional attempt to change the burden of proof for free exercise cases established by the Supreme Court in *Employment Division, Department of Human Resources v. Smith. See Flores v. Boerne,* 877 F.Supp. 355 (W.D.Tex.1995).

RFRA. 42 U.S.C. § 2000bb–3(a). The Court, therefore, must apply RFRA in this case.

The threshold inquiry under RFRA is whether the statute in question substantially burdens a person's religious practice. If there is no substantial burden, RFRA does not apply. To show that government action substantially burdens a religious practice,

> the religious adherent ... has the obligation to prove that a governmental [action] burdens the adherent's practice of his or her religion ... by *preventing* him or her from engaging in conduct or having a religious experience which the faith mandates. This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine. [Emphasis added.]

*Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir. 1995) (quoting *Graham v. C.I.R.,* 822 F.2d 844, 850–51 (9th Cir.1987), *aff'd sub nom., Hernandez v. C.I.R.,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148–49, 104 L.Ed.2d 766 (1988)); *Werner v. McCotter,* 49 F.3d 1476 (10th Cir. 1995). As the Tenth Circuit stated: "To exceed the 'substantial burden' threshold, government regulation must significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion." *Werner,* 49 F.3d at 1480 (citations omitted). To be a "substantial burden," the government action must either compel a person do something in contravention of their religious beliefs or require them to refrain from doing something required by their religious beliefs. *See Hobbie v. Unemployment Appeals Comm'n,* 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987) (denying unemployment benefits to a person who was fired because she refused to work on the sabbath placed a substantial burden on that person's free exercise of religion); *Fleischfresser v. Directors of School District 200,* 15 F.3d 680 (7th Cir.1994) (no substantial burden existed where school district reading series did not compel parents to do or refrain from doing anything of a religious nature); *Vernon v. Los Angeles,* 27 F.3d 1385, 1393–94 (9th Cir. 1994) (no substantial burden where "government action is neither regulatory, proscriptive, or compulsory in nature").

In this case, the trustee is seeking to recover under 11 U.S.C. § 548(a)(2) money the debtors tithed to their church. Tithing is central tenet of the debtors religion, and one that the debtors regularly practiced. However, there is no evidence that § 548(a) prevents the debtors or any other church member from tithing. Indeed, the present record certainly does not suggest that § 548 prevented these debtors from tithing. Equally important, the church has no records which might show that *other* members did not tithe because of § 548 since no one ever checks to see if members actually do tithe. The funds the trustee seeks to recover *have already been tithed* to the defendant. The debtors, in all likelihood, continue to tithe to the defendant. The debtors fulfilled their religious obligation by tithing in the year prior to their bankruptcy filing. The statute, by its own operation, does nothing to prevent the debtors' fulfillment of their personally held religious obligation to tithe and, therefore, does not place a "substantial burden" on the debtors' practice of their religion. While not evidence of the impact of § 548 on religious fund raising, the fact that similar statutes have existed for over 400 years and generated virtually no reported cases suggests that any impact is de minimus.

Even assuming that § 548(a) did place a substantial burden on the debtors' religious practice, it serves a compelling governmental interest. A statute may substantially burden religious practice if a compelling interest is at issue. *Hernandez v. C.I.R.,* 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). The government has a compelling interest in a variety of situations. *See id.* at 699, 109 S.Ct. at 2148–49 (government has a compelling interest in maintaining a sound income tax system); *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (government has a compelling interest in maintaining a uniform so-

cial security tax system); *Goldman v. Weinberger*, 475 U.S. 503, 508–10, 106 S.Ct. 1310, 1313–14, 89 L.Ed.2d 478 (1986) (government has a compelling interest in maintaining order and uniformity in the military). Section 548(a), and the Bankruptcy Code as a whole, serve a compelling governmental interest. *See Christians v. Crystal Evangelical Free Church (In re Young)*, 152 B.R. 939, 954 (D.Minn.1993) ("The government's policy of allowing debtors to get a fresh start while at the same time treating creditors as fairly as possible qualifies as a compelling interest."); *In re Navarro*, 83 B.R. 348, 353 (Bankr. E.D.Pa.1988) (the "administration of the bankruptcy system and protection of the legitimate interests of creditors" serves a compelling governmental interest); *cf. United States v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973) (right to actual discharge in bankruptcy is not a compelling interest). The compelling nature of the interest is reflected in the fact that recovery of fraudulent transfers has been a basic tenet of bankruptcy law for 400 years.

Further, the Court also finds that § 548(a) is sufficiently narrow to survive RFRA challenge. The portion of the statute at issue in this case only allows for recovery those transfers of the debtor's property which occurred within one year of the bankruptcy filing, occurred while the debtor was insolvent, and that were not given in exchange for reasonably equivalent value. 11 U.S.C. § 548(a)(2). Clearly, the statute was drawn in such a way as to balance the ability of the debtor to dispose of property with the need to protect unsecured creditors. For example, if in this case the debtors had not been insolvent on the dates that the transfers to the defendant took place, then the transfers would not be recoverable. Only when all of the requirements of § 548(a)(2) are met is the trustee able to recover the transfer.[14]

Based on the foregoing, the Court finds that application of 11 U.S.C. § 548(a)(2) does not violate the debtors' free exercise rights under the First Amendment's Free Exercise Clause because the statute is neutral on its face and has only an incidental effect on the debtors' exercise of their religious beliefs. Further, the statute does not violate RFRA because it does not substantially burden the debtors' exercise of their religious practices and also because it is narrowly drawn and serves a compelling governmental interest.

The Court, therefore, grants the trustee's Complaint to Recover Fraudulent Transfers. The trustee is entitled to recover $2,442.22 from the defendant.

The foregoing constitutes findings of fact and conclusions of law as required by Fed. R.Civ.P. 52(a) and Fed.R.Bankr.P. 7052. A separate judgment will be entered giving effect to the determinations reached herein.

---

**14.** Congress clearly could exempt tithing from the reach of § 548 as it has certain transactions from § 547. *See, e.g.,* 11 U.S.C. § 547(c)(8).