In the Matter of Joseph & Mary ABRAHAM, Debtors.

Joseph & Mary ABRAHAM, Plaintiff,

v.

CENTRAL TRUST COMPANY, Defendant.

CENTRAL TRUST COMPANY, Plaintiff,

v.

Joseph & Mary ABRAHAM, Defendants.

Bankruptcy No. 82–1622.

Adv. Nos. 82–1015, 82–783.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Oct. 26, 1983.

John K. Olson, Robert M. Quinn, Tampa, Fla., Paul S. Groschadl, Woods, Oviatt, Gilman, Sturman & Clarke, Rochester, N.Y., for Central Trust Co.

Don M. Stichter, Stichter & Riedel, P.A., Tampa, Fla., for Joseph and Mary Abraham.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Bankruptcy Judge.

THIS IS a Chapter 11 reorganization case and the matters before the Court involve two separate, but closely related adversary proceedings. The first adversary proceeding was initiated by a Complaint for Relief from Stay or Adequate Protection filed by Central Trust Company (Bank), a New York banking concern and a creditor of Joseph and Mary Abraham (the Debtors), (*Central Trust Company v. Abraham,* Adv. No. 82–783). The second adversary proceeding was commenced by the Debtors who seek to invalidate a mortgage lien of the Bank on residential property owned by the Debtors located in Webster, New York. (*Abraham v. Central Trust Company,* Adv. No. 82–1015). Although the adversary proceedings were tried separately, obviously both proceedings involve a dispute which arose from a series of commercial transac-

tions between the parties which ultimately resulted in the execution of a mortgage involved in the matters under consideration.

By consent of the parties, testimony and exhibits produced at both the trials (Adv. No. 82–783 and Adv. No. 82–1015) have been combined to form one complete record. Thus, it is appropriate to resolve the issues in both adversary proceedings due to the interrelation of the parties and their sustained and continuing business relationship; the factual circumstances giving rise to the controversies, which are the same in both cases; and the ultimate legal issues to be decided by the Court.

The matters under consideration are not "related matters" as defined by the Emergency Local Rule (d)(3)(A) and, therefore, by virtue of subclause (d)(2) of the Emergency Local Rule, a separate final judgment entered in these two adversary proceedings shall be effective upon entry by the Bankruptcy Court unless stayed pursuant to Bankruptcy Rule 8005 by the Bankruptcy Court or by the District Court.

The facts relevant to the resolution of the issues presented by both adversary proceedings as developed at extensive final evidentiary hearings can be summarized as follows:

Joseph A. Abraham is the President and principal shareholder of Joseph A. Abraham Enterprises, Inc. and several related companies including D.A. LePine, Inc.; Pine Wood Construction; APCO Equipment Corporation; A. Plotzker and ABC Electrical Services. All these entities were involved primarily in the business of general construction in Rochester, New York and lately in Ft. Myers, Florida. Some, but not all, of the corporate entities controlled by the Debtors are currently debtors in cases pending under Title 11.

In 1972, the Debtors, who were at that time residents of the State of New York, purchased residential lakefront property located at 1660 Lake Road, Webster, New York, a suburb of Rochester. In conjunction with this purchase, the Debtors executed a note and a mortgage in favor of the Bank in the principal amount of $65,000 (Bank's Exh. # 1). The balance on this mortgage at the time of the trial on the Complaint to Lift Stay filed by the Bank was approximately $52,500.

In 1973, the Debtors executed a second mortgage on the Webster residential property, in favor of the United States Small Business Administration (SBA). The balance on the second mortgage is, at this time, approximately $17,000.

The Debtors continued to reside in New York at the Webster residence until 1980 when they relocated in Ft. Myers, Florida. Although the Debtors spend the majority of their time at their primary residence in Ft. Myers, they retain the New York property for family use during summer vacations and for Mr. Abraham's use when business necessitates his presence in Webster, New York.

On September 15, 1980, the Debtors applied for and obtained an additional loan from the Bank. This was a term loan. The Debtors executed a collateral note in the principal amount of $280,000. This loan was secured by certain heavy equipment used by one of the entities controlled by the Debtors. For tax purposes, the equipment was titled to the Debtors individually and was leased by them to one of the entities controlled by the Debtors. (Bank's Exh. # 3 & # 4). In due course, the Bank perfected its security interest in the collateral by filing financing statements with the Secretary of State for the State of New York. It should be noted that sometime later, the Bank discovered that most of the heavy equipment which stood as partial security for the $280,000 loan was removed to Florida without the permission of the Bank. It is without dispute that no steps had been taken by the Bank to perfect its security interest in this collateral in Florida. The equipment which remained in New York was minimal in value. In fact, the total value of the equipment which was pledged as collateral for this loan and which is still in New York is approximately $15,800 securing an indebtedness in the approximate amount of $300,000 with interest accruing at a per diem rate of $127.90.

In December 1981, all corporations controlled by the Debtors were experiencing serious cash flow problems. Mr. Abraham once again approached the Bank for the purpose of obtaining additional funds through a new loan and sought to borrow approximately $600,000–$700,000.

In connection with this attempt of refinancing, Mr. Abraham attended several meetings with bank officers in early 1982 in Rochester, New York. These meetings focused primarily, if not solely, on lending new monies to the Debtors for use by the various Abraham enterprises. Because of the renewed activity relating to the Abraham loan file, the Bank began analyzing its exceedingly undersecured position with respect to past advances to the Debtors. It appears that as late as December, 1981, the Bank was still unaware that it was grossly undercollateralized on the $280,000 loan and, in fact, the Bank did not learn of its dangerous collateral position until mid-March, 1982. At this point (mid-March, 1982), while still continuing to pursue the possibility of lending more money to the Debtors, the Bank engaged Gary F. Amendola and the law firm of Woods, Oviatt, Gilman, Sturman & Clark to review the entire Abraham loan portfolio and to take any possible curative steps needed to improve the Bank's collateral position, although it is without dispute that the Bank was still involved in negotiations with the Debtor regarding the possibility to lend additional funds to the Debtors. It is equally clear, however, that there was never any firm loan commitment made by the Bank.

On March 25, 1982, Gary Amendola and Kathryn Bascom, the Bank's loan officer in charge of the Abraham loan portfolio, flew from Rochester, New York to Ft. Myers, Florida for the purpose of exploring the possibility of (1) meeting with officers of Barnett Bank of Ft. Myers to discuss a possible participation loan for the Abraham companies; and (2) to have the Debtors execute a package of documents designed to improve the Bank's security position. The package included a collateral note in the amount of $20,274.84 and a mortgage securing the note in the principal amount of $100,000 on the Debtors' residential proper-

ty located in Webster. It appears that Mr. Abraham met Mr. Amendola and Ms. Bascom at the airport upon their arrival and took them, at their request, to the Abraham condominium to complete the necessary paper work. After the Debtors signed all documents prepared by Mr. Amendola and Ms. Bascom, Ms. Bascom arranged for wire disbursements of $20,274.84 to various New York equipment lessors to whom the Debtors owed substantial sums and who were about to repossess the equipment due to a default under the leases covering the equipment. Ms. Bascom then went to the Post Office to send the signed documents (including the mortgage and U.C.C. financing statements) by express mail to the appropriate agencies for recording and/or filing in Rochester, Albany and Tallahassee and thereafter went with Mr. Amendola and Mr. Abraham to Barnett Bank to discuss the possibility of the participation financing agreement with Barnett. It soon became clear that Barnett Bank was not interested in pursuing the proposed participation loan with the Debtors and the Bank.

The execution of the collateral note in the principal amount of $20,274.84 (Bank's Exh. # 6) and the collateral security mortgage encumbering the Debtors' property in Webster, New York in the amount of $100,000 represents the culmination of the Bank's formal transactions with the Debtors and forms the basis for the controversies under consideration. While the Bank continued negotiations with the Debtors regarding the possibility of granting any additional loans to the Debtors, the negotiations came to a complete halt when the Bank learned from the financial statements prepared by the auditors that the Debtors' business concerns were in need of approximately $1 million in new capital, an amount which was substantially more than any amount previously anticipated and discussed, and the financial positions of the entities controlled by the Debtors did not support any new advances in any amount, not even the already outstanding indebtedness.

There is no doubt that the Bank did, at the outset of the negotiations, seriously consider restoring the Debtors' loan portfolio.

It is clear that no fixed numbers were arrived at and the new loan was clearly dependent on the receipt of a satisfactory and reliable financial statement of the Debtors and the enterprises of the Debtors.

In support of its contention that it should be permitted to proceed to enforce its lien against the Webster property, the Bank contends that it holds a valid and perfected first mortgage on the Webster property which secures a debt of $52,129.27; that the property is also encumbered by a valid second mortgage held by the SBA securing a debt in the amount of $17,000 and the Bank holds a valid third mortgage securing a debt of $100,000 plus interest and expenses representing a combined indebtedness secured by valid liens encumbering the Webster property in excess of $169,000. The fair market value of the Webster property is approximately $186,000. It is the Bank's position that if the Debtor has equity in the Webster property, it is marginal if any and this property is not necessary for an effective reorganization and, in any event, the Debtors have failed to offer adequate protection to the Bank. Therefore, so contends the Bank, it is entitled to be relieved from the automatic stay in order to pursue its non-bankruptcy remedies in a court of competent jurisdiction against the collateral, specifically against the Webster property.

It is clear that the Bank's right to the relief sought is predicated on the assumption that the mortgage executed on March 25, 1982 securing a debt of $100,000 represents a valid and enforceable encumbrance on the Webster property, a proposition vigorously challenged by the Debtors. Thus, the initial inquiry must focus on the Debtors' contentions as set forth in their Complaint to Invalidate Mortgage Lien, that the mortgage dated March 25, 1982 was executed only as part and parcel of a larger loan transaction to be completed in the near future, rather than for the purpose of securing a pre-existing indebtedness. In this connection, the Debtors contend that the mortgage should be invalidated because of (1) lack of consideration; (2) failure of consideration; (3) conditional delivery; and (4) as a fraudulent transfer voidable pursuant to § 548 of the Bankruptcy Code.

At first blush these contentions appear to be persuasive in light of the ongoing negotiations between the Debtors and the Bank. However, they do not bear a close analysis.

There is hardly any doubt that the Bank simply took advantage of the Debtors' desperate need for a considerable amount of funds and did intend to obtain additional collateral to secure antecedent debts while concurrently considering a possible new loan. The Debtors, caught in a financial crisis, signed the documents with perhaps more hope than realistic belief that a new loan would be approved, additional monies would be forthcoming and the businesses would be saved. Be that as it may, the Debtors willingly entered into the agreements without a firm commitment from the Bank that new money would be forthcoming and, as noted above, the new loan never materialized. While the Debtors failed to realize the desired result, there is no factual or legal support to conclude that the mortgage encumbering the Webster property is invalid based on the various theories advanced by the Debtors.

■ It is a well accepted proposition that a pre-existing or antecedent debt may constitute sufficient consideration to support a mortgage. *Ocklawaha River Farms Co. v. Young*, 73 Fla. 159, 74 So. 644 (1917); *Kitchens v. Kitchens*, 142 So.2d 343 (Fla. 2d DCA 1962); *see also*, 11 U.S.C. § 548(d)(2)(A). The mortgage encumbering the property located in Webster which was executed on March 25, 1982 states in pertinent part:

> "The purpose of this mortgage is to give Mortgagee a continuing security for the payment when due of *all debt* which Mortgagee holds against Mortgagor. This Mortgage shall secure debt that is *direct or contingent*. It shall secure debt that is *now due or may be due* in the future. It shall secure renewals and extension of debt. The total amount of debt that is secured shall not exceed at any one time one hundred thousand and

no/100 dollars ($100,000) . . . (emphasis supplied)

There is no doubt that the language quoted intended to secure all debts owed by the Debtors to the Bank whether the debt was an antecedent unsecured debt or a debt based on a possible future advance. It is without dispute that at the time the Debtors executed the mortgage under consideration in Ft. Myers, they were already heavily indebted to the Bank. The record clearly shows that in March, 1982, there was a substantial antecedent debt which was more than ample to furnish a legally sufficient consideration to support the mortgage and the security interest granted by the Debtors.

Next, the Debtors seek to invalidate the mortgage on the ground that the same was delivered only conditionally in anticipation of additional funds from the Bank. Considering this contention of the Debtors, it is clear that the Debtors did, in fact, hope to obtain additional funds from the Bank sufficient to rescue them and their various enterprises from their precarious and almost terminal financial position. However, it is equally clear that the Bank never made a firm commitment to lend any funds, but merely negotiated and explored the possibility and while the Debtors assumed, albeit, without any firm foundation that the funds will be forthcoming, had no justified basis for this assumption.

Based on the foregoing, this Court is satisfied that the Debtors did execute the mortgage well knowing that they had no binding commitment from the Bank for any additional funds hoping to be able to get sufficient additional funds to rescue the faltering enterprises. The fact that their hopes turned out to be nothing but the wishful thinking of a man grasping for straws does not change the stark reality of the situation which existed at the time the Debtors met with the Bank representatives in Ft. Myers. It is clear that the Debtors executed and delivered the mortgage unconditionally realizing that without it the possibility of obtaining additional funds from the Bank was nil.

This leaves for consideration the last contention of the Debtors that the execution of the mortgage, the validity of which is challenged, was a fraudulent transfer voidable by the Trustee pursuant to § 548 of the Bankruptcy Code, and by a debtor-in-possession who is armed with the special voiding powers available to the trustee in general by virtue of § 1107 of the Bankruptcy Code. This record is completely devoid of any evidence which would sustain the claim of a fraudulent transfer under any of the provisions of § 548 of the Code. As noted earlier, at the time this mortgage and the security agreement were executed by the Debtors, the Debtors were already heavily indebted to the Bank. It is well established that the existence of a pre-existing debt precludes the finding that a transfer is fraudulent under this Section provided, of course, that the value of the additional consideration represents a fair and adequate consideration. *In re Tastyeast, Inc.,* 126 F.2d 879 (3rd Cir.1942), cert. den. 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942). Consideration need not necessarily be present consideration in order to be fair within the scope of the Bankruptcy Act of 1898, 11 U.S.C. § 107(d) and there is nothing in § 548 of the Bankruptcy Code which represents a major change from the former Section at all. Accordingly, when a property is transferred or an obligation is incurred for the purpose of security it is only necessary that its value not to be disporportionately large as compared with the amount of the advance of a debt secured. *Inland Security Co., Inc. v. Estate of Kirshner,* 382 F.Supp. 338 (W.D.Mo.1974). There is no allegation in this complaint filed by the Debtors that this transfer was made with the actual intent to hinder, delay or defraud a creditor, thus, a voidable fraudulent transfer under § 548(a)(1). Neither are there allegations that as a result of a transfer, the Debtors, who were engaged in business, were left with unreasonably small capital, thus, voidable under § 548(a)(2)(B)(ii), or that the Debtors intended to incur or believed that they will incur debts which would be beyond their ability to repay as such debts matured—

again voidable under subclause (iii) of § 548(a)(2)(B). This being the case, the execution of the mortgage cannot be found to be a voidable fraudulent transfer under § 548 of the Code.

■ It is intimated by the Debtors, although not very well articulated, that the Bank's mortgage on the Webster property may be avoided on a theory of common law fraud or trickery, and it is, therefore, voidable by the Debtors by virtue of § 544(b). This Section permits a trustee and in turn a debtor-in-possession to set aside and avoid a transfer which is voidable as fraudulent under an applicable non-bankruptcy law, state or federal. Under this Section, there must be a showing that at the time of the transfer there was, in fact, a creditor in existence holding a valid claim against the Debtors who could have avoided the transfer in question under the applicable non-bankruptcy law.

To prevail under this theory, there must be persuasive proof that the transfer was the result of materially false statements made with a specific intent to defraud and the defrauded party reasonably relied on the false statement and as the result suffered damages. The burden to establish the operative elements of a fraud under this theory is clearly on the party who is challenging the transfer who must present convincing proof on each operative element of an actionable fraud. "A party alleging fraud must prove it and the burden of proof rests on the complainant, the presumption being against the existence of fraud." *Scott v. Dansby,* 334 So.2d 331 (1st DCA Fla.1976).

■ Viewing this record against these general principles, it is evident that the Debtors failed to carry the burden placed on them by law. There is simply no evidence in this record to support the contention that the Bank obtained the mortgage on the Webster property and other collateral with trickery or fraud. While one may conclude that the Debtors might have been lulled into false security by the Bank, they had no justifiable basis to rely on anything which the Bank said or did on March 18, the date the mortgage was executed. This be-

ing the case, the Debtors' challenge on the validity of the mortgage on the Webster property cannot be sustained under this theory.

■ This leaves for consideration the Bank's right to relief from the automatic stay. In light of the fact that the Debtors have some equity in the subject property in spite of the finding that the Bank's third mortgage is valid, the Court is of the opinion that the stay should remain in force for a limited time to allow the Debtors the opportunity to offer adequate protection.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Debtors shall have 15 days from the date of entry of this Order in which to make an offer of adequate protection to Central Trust Company, which offer must be filed with the Court. Upon acceptance of the offer of adequate protection by the Bank, a final judgment shall be entered by this Court in the proceeding styled, "Central Trust Company v. Abraham, Adversary Proceeding No. 82–783." In the event that the offer is deemed unacceptable by the Bank, a hearing shall be scheduled on the issue of adequate protection. It is further

ORDERED, ADJUDGED AND DECREED that the automatic stay shall remain in full force and effect until further order of this Court. It is further

ORDERED, ADJUDGED AND DECREED that a separate final judgment shall be entered in accordance with the foregoing in the proceeding styled, "Abraham v. Central Trust Company, Adversary Proceeding No. 82–1015."