In re James Milton **SOLOMON**, doing business as Officer & Director of Sabre Intl.; and Carla Dean Solomon, doing business as Officer & Director of Sabre Intl., Debtors.

**Stillwater National Bank and Trust Company, Plaintiff–Appellant,**

v.

**Scott P. Kirtley, Trustee, Defendant–Appellee,**

**Gold Bank, Defendant.**

BAP No. NO–03–006.
Bankruptcy No. 01–04480–M.
Adversary No. 02–0057–M.

United States Bankruptcy Appellate Panel for the Tenth Circuit.

Oct. 6, 2003.

Bryan J. Wells, Connor & Winters, P.C., Oklahoma City, OK (Jared D. Giddens with him on the brief), for Plaintiff–Appellant.

Scott P. Kirtley, Tulsa, OK, trustee, pro se.

Before CLARK, NUGENT, and THURMAN, Bankruptcy Judges.

OPINION

NUGENT, Bankruptcy Judge.

This appeal involves an adversary proceeding brought by Stillwater National Bank & Trust Company ("Bank") against the Chapter 7 trustee Scott P. Kirtley ("Trustee") seeking a determination that two prepetition mortgages covering commercial real property given by the debtors to secure their existing guaranty of the debt of Sabre International, Inc. ("Sabre") were valid and enforceable liens against the property and prior to the interest of the Trustee in the property. The Trustee counterclaimed, asserting that the mortgages were avoidable as fraudulent transfers pursuant to 11 U.S.C. §§ 544(b) and 548(a)(1)(B). Following trial, the bankruptcy court granted judgment in favor of the Trustee and avoided the mortgages. The bankruptcy court found that debtors were insolvent at the time of the transfers and that debtors did not receive reasonably equivalent value in exchange for the mortgages. The Bank timely appeals from the bankruptcy court's judgment.[1] We AFFIRM.

*Factual Background* [2]

The debtors James Solomon and Carla Solomon ("Debtors") were the sole shareholders, directors, and officers of Sabre. Sabre was engaged in the pipeline construction business, distributing parts and supplies and making custom alterations to machinery used in the industry. Sabre conducted its business on three tracts of real property ("Commercial Property") owned by the James M. Solomon and Carla D. Solomon Revocable Living Trust ("Trust"). The Debtors were the trustees of the Trust. Sabre paid monthly rent of $30,000 to the Trust for its use of the

1. This Court has jurisdiction to hear timely appeals from final orders of a bankruptcy court. 28 U.S.C. § 158(a)(1) and (b)(1); Fed. R. Bankr.P. 8001 and 8002. The parties have consented to this Court's jurisdiction by not opting to have the appeal heard by the United States District Court for the Northern District of Oklahoma. 28 U.S.C. § 158(c)(1); Fed. R. Bankr.P. 8001(e).

2. Many of the facts recited below derive from the parties' stipulation of facts contained in the Pretrial Order entered October 11, 2002. *See* Pretrial Order at 2–4, *in* Appellant's Appendix I at 198–200.

Commercial Property.[3] At all times relevant to this case, the Commercial Property had a value of at least $2 million.[4]

The Bank has been Sabre's principal operating lender since 1995. Sabre's debts to the Bank were secured by blanket liens on its assets, including its equipment and inventory, and a pledge of Debtors' voting stock in Sabre. In addition, the Debtors and the Trust personally and unconditionally guaranteed all of Sabre's obligations to the Bank. As of March 31, 2000, Sabre was indebted to the Bank in the approximate amount of $8.8 million.

At this same time, the Debtors' financial condition as reflected by the March 31 balance sheet showed that Debtors had assets of $2,947,900 and liabilities of $10,823,000.[5] Debtors valued the Commercial Property at $2,100,000 and their Sabre stock at $0. They carried their Sabre guaranty obligation to the Bank at $7,000,000 and liability to Gold Bank at $1,400,000. According to Sabre's audited financial statements for the year ended June 30, 2000, there was a deficit of $1,531,324 in stockholders' equity.[6] There was no significant improvement in Debtors' financial condition subsequent to March 31, 2000. According to Debtors' personal financial statement as of June 30, 2000, the value of the Commercial Property remained at $2.1 million while the value of their Sabre stock was $1.7 million. However, this personal financial statement did not reflect the Debtors' guaranty of the nearly $9 million Sabre debt to the Bank as a liability.[7]

*March 31, 2000 Restructuring/Mortgage*

On March 31, 2000, the Debtors, Sabre, and the Bank agreed to "restructure" a portion of this debt. Sabre executed a 30 day promissory note in favor of the Bank in the principal amount of $350,000. The Debtors and the Trust personally and unconditionally guaranteed this note by the execution of a new guaranty. In addition, the Debtors, through the Trust, granted the Bank a mortgage ("the March Mortgage") on one tract of the Commercial Property in the amount of the note. This mortgage contained an assignment of rents clause, granting the Bank an interest in the rent that Sabre paid to the Trust for the use of the Commercial Property. The March Mortgage was recorded on April 27, 2000.[8]

3. James Solomon testified that he and his wife received the rent, but that all of the rent went to pay taxes and existing mortgages on the Commercial Property.

4. Prior to 2000, only two tracts of the Commercial Property were encumbered. Citizens Bank of Tulsa, and later Gold Bank, as assignee or successor, held a mortgage against tract one of the Commercial Property, and another mortgage against tract two of the Commercial Property to secure certain promissory notes that the Debtors had executed in Citizens Bank's favor. Citizens Bank's claim against the Debtors never exceeded $1.6 million and, therefore, this indebtedness was always fully secured by the Commercial Property. The mortgages contained an assignment of rents clause, thus granting Citizens Bank, and later Gold Bank, an interest in the rent that Sabre paid to the Trust.

5. *See* Defendant's Trial Exhibit 28, *in* Appellant's Appendix II at 469.

6. According to the auditors' report, the financial statements did not disclose information that raised "substantial doubt about [Sabre's] ability to continue as a going concern." By virtue of Sabre's negative net worth at June 30, 2000 the auditors noted that Sabre was in default of a minimum net worth covenant under its note with the Bank. *See* Trial Exhibits, *in* Appellant's Appendix II at 429, 434.

7. *See* Trial Exhibits, *in* Appellant's Appendix II at 439.

8. This mortgage transfer was made by the Debtors outside the one year look-back period prior to commencement of Debtors' Chapter 7 case. *See* 11 U.S.C. § 548(a)(1) and (d)(1).

It is undisputed that the Bank did not provide Sabre or the Debtors any new funds for the $350,000 note. Rather, it applied the loan proceeds to the accrued interest and a portion of the principal on Sabre's $8.8 million debt. This application of funds brought Sabre current on its obligations to the Bank for a one month period. Moreover, the application of the $350,000 loan did not reduce the Debtors' liability to the Bank because they had guaranteed the March 31, 2000 note. The net effect of Debtors' granting of the March Mortgage was to convert a portion of their previously unsecured guaranty into a secured debt to the extent of $350,000.

Sabre and the Debtors defaulted on the restructured obligation at the end of April.[9] By September 2000, Sabre's debt to the Bank was in excess of $9 million. The Debtors and the Trust were also liable for this $9 million debt by virtue of their guaranties.

### *September 29, 2000 Restructuring/Mortgage*

On September 29, 2000, the Debtors, Sabre and the Bank agreed to a second "restructure" of a portion of the debt. The Debtors and the Trust executed a promissory note in favor of the Bank in the principal amount of $612,721.42.[10] This note was secured by an additional mortgage ("the September Mortgage") on all three tracts of the Commercial Property. The September Mortgage also secured the indebtedness owed by the Debtors and the Trust to the Bank by virtue of their previous guaranties. This mortgage contained an assignment of rents clause, granting the Bank an interest in the rent that Sabre paid for the use of the Commercial Property. The Bank recorded the September Mortgage on October 18, 2000.[11]

The Bank applied the loan proceeds of the second restructure to Sabre's $9 million obligation (including payoff of the $350,000 March note), thus reducing Sabre's debt to $8.8 million. Again, the Bank did not provide Sabre or the Debtors any new funds for the $612,000 note. But, the Debtors' and the Trust's indebtedness to the Bank under the September note and previous guaranties increased to approximately $9.4 million. In addition, the Bank now had a further lien against the Commercial Property[12] and the Debtors no longer had any non-exempt, unencumbered assets.

Sabre and the Debtors again soon defaulted on their obligations to the Bank[13] and the Bank commenced an action in

---

However, pursuant to 11 U.S.C. § 544(b)(1), this transfer is subject to scrutiny under Oklahoma's Uniform Fraudulent Transfer Act, Okla. Stat. tit. 24, § 112 *et seq.* The Oklahoma UFTA contains a four year statute of limitations. *See* Okla. Stat. tit. 24, § 121. 11 U.S.C. § 546(a) provides the limitations period for bringing avoidance actions under § 548 and § 544.

9. The Bank was dishonoring numerous checks drawn on Sabre's checking account due to insufficient funds, and Sabre's account was in overdraft status.

10. This promissory note was for a term of fifteen (15) years. Debtors' monthly payments under the note were $6,773.02.

11. This mortgage transfer was made by the Debtors within the one year look-back period of § 548. *See* 11 U.S.C. § 548(a)(1) and (d)(1).

12. The Bank's lien against the Commercial Property was second only to the mortgage of Citizens Bank/Gold Bank. *See* Note 4, *supra.*

13. The Bank's senior vice-president, Carol Kinzer, testified that Sabre was in default by January. Trial Transcript, *in* Appellant's Appendix II at 251.

state court against Sabre, the Debtors and the Trust. A receiver was appointed for Sabre. The Bank exercising its right to vote the Debtors' stock in Sabre, commenced a Chapter 11 petition for Sabre.

### Debtors' Chapter 7 case

On October 3, 2001, the Debtors filed a Chapter 7 petition. According to Debtors' schedules, the Commercial Property was the only non-exempt real property owned by the Debtors and its fair market value was shown as $2 million.[14] Debtors valued their 100% stock ownership in Sabre at zero. Debtors did not list in Schedule F their guaranty of the $8 million Sabre debt to the Bank.[15] They did list as a secured claim, a debt of $595,562 to the Bank, secured by the September Mortgage on the Commercial Property. In April 2002, Gold Bank assigned its interest in the Debtors' prior notes and mortgages to the Bank. The amount of this transferred claim was $1,567,895.

On March 12, 2002 the Bank commenced the adversary proceeding against the Trustee, seeking a declaration that the March Mortgage and September Mortgage were valid, enforceable, and prior to the Trustee's interest. The Trustee filed a counterclaim, seeking to avoid the March and September Mortgages as fraudulent transfers. The Trustee alleged that the March Mortgage (made within two years of the Debtors' petition date) was an avoidable transfer under § 544(b) and an unspecified section of Oklahoma's Uniform Fraudulent Transfer Act ("UFTA"), and that the September Mortgage (made within one year of the Debtor's petition date) was an avoidable transfer under § 548(a)(1)(B)(I) and (ii)(I) as well as § 544(b) and the Oklahoma UFTA.

The Bank moved for partial summary judgment on the Trustee's counterclaim, arguing that the March and September Mortgages were not avoidable as a matter of law because the Debtors received "reasonably equivalent value in exchange" for them within the meaning of § 548(a)(1)(B)(I) and the Oklahoma UFTA. The Trustee responded to the Bank's summary judgment motion. On August 6, 2002, the bankruptcy court denied the Bank's summary judgment motion, summarily stating that summary judgment was not appropriate because genuine issues of material fact existed.

On October 24, 2002, trial was held. The bankruptcy court issued its Memorandum Opinion on January 9, 2003. It concluded that the Trustee satisfied his burden of proof on the two elements in dispute under § 548(a)(1)(B) and the Oklahoma UFTA: (1) Debtors' insolvency at the time of the transfers; and (2) the lack of reasonably equivalent value received by Debtors in exchange for the March and September Mortgages.[16] Accordingly, the bankruptcy court granted judgment in favor of the Trustee on its counterclaim and avoided the March and September Mortgages.

---

**14.** The Trustee revoked the James M. Solomon and Carla D. Solomon Revocable Living Trust, thereby consolidating the Trust's assets and debts, notably the Commercial Property and the Citizens Bank/Gold Bank mortgages into the Debtors' bankruptcy estate.

**15.** Debtors did identify several other guarantees of corporate debt in their schedule of unsecured claims. The Debtors' total unsecured debt was in excess of $2 million.

**16.** The bankruptcy court treated § 548(a)(1)(B) and Oklahoma's UFTA as identical avoidance statutes and determined that both require a showing of insolvency and lack of reasonably equivalent value. Thus, the bankruptcy court analyzed the transfers solely under § 548 while noting the distinction between the two statutes' look-back periods and statute of limitations. *See* Note 8, *supra*.

### Analysis

The Bank contends that the bankruptcy court erred in avoiding the March and September Mortgages. It challenges the bankruptcy court's findings that the Debtors were insolvent at the time of the transfers and that the Debtors did not receive reasonably equivalent value in exchange for the mortgages.

### Standard of Review

■ The determinations concerning reasonably equivalent value and debtor's insolvency are questions of fact governed by a clearly erroneous standard of review.[17] Under this standard, the bankruptcy court's findings will not be disturbed unless this Court is left with the definite and firm conviction that a mistake has been made.[18] Conclusions of law, however, are reviewed de novo.[19]

### Section 548 and the UFTA

Because of the one year look-back period in § 548(a)(1), only the September Mortgage is potentially avoidable under § 548.[20] The March Mortgage and the September Mortgage are potentially avoidable under the extended "look-back" provisions of Oklahoma's UFTA through § 544(b).[21]

It is somewhat unclear upon which provision of the Oklahoma UFTA the bankruptcy court relied to avoid the March Mortgage. Although the bankruptcy court made a footnote reference to Oklahoma UFTA § 116(A)(2) in its Memorandum Opinion,[22] we question this reference because the bankruptcy court's analysis focused on the two elements of fraudulent transfer avoidance under both § 548(a) and the UFTA: insolvency and reasonably equivalent value.[23]

The Trustee did not specify, either in his counterclaim or the pretrial order, the particular UFTA provision under which he proceeded. In both pleadings, the Trustee simply referred to § 544(b). However, in the Trustee's response to the Bank's summary judgment motion as well as his closing argument and trial brief, it is clear that the Trustee invoked both §§ 116 and 117 of the Oklahoma UFTA to avoid the mortgages.[24] The parties' statement of the issues of fact in the pretrial order also implicate the statutory language of both §§ 116 and 117.

A review of the language of these two UFTA provisions and a comparison with the language of § 548(a)(1)(B)(I) and (ii)(I) leads us to conclude that the bankruptcy court relied upon and avoided the mortgages under § 117(A) of Oklahoma's UFTA, rather than § 116(A)(2). Section

**17.** *Clark v. Security Pacific Business Credit, Inc. (In re Wes Dor, Inc.)*, 996 F.2d 237, 242 (10th Cir.1993).

**18.** *In re Miniscribe Corp.*, 309 F.3d 1234, 1240 (10th Cir.2002).

**19.** *In re Tuttle*, 291 F.3d 1238, 1240 (10th Cir.2002).

**20.** The September Mortgage was recorded October 18, 2000, within one year of Debtors' Chapter 7 case filed on October 3, 2001.

**21.** *See* 11 U.S.C. § 544(b). As noted previously, Oklahoma's UFTA contains a four year statute of limitations, thereby permitting an

avoidance action commenced within four years of the transfer. Okla. Stat. tit. 24, § 121. The March Mortgage was recorded April 27, 2000, well within the four year period.

**22.** *See* Memorandum Opinion at 10 n. 25, *in* Appellant's Appendix II at 509.

**23.** Section 116(A)(2) of the Oklahoma UFTA makes no reference to "insolvency" as an element of this avoidance action.

**24.** *See* Okla. Stat. tit. 24, § 116 and § 117.

548(a)(1)(B) is the constructive fraud provision relied upon by the Trustee.[25] Oklahoma's UFTA contains two constructive fraud provisions: §§ 116(A)(2) and 117(A). The key distinction between §§ 116(A)(2) and 117 is that § 116(A)(2) determines transfers that are fraudulent to present *and* future creditors while § 117 determines transfers that are fraudulent to present creditors only.[26] Section 116(A)(2) does not contain a reference to balance sheet insolvency as an element while § 117(A) does. Section 117(A) reads:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation *without receiving a reasonably equivalent value in exchange for the transfer* or obligation *and the debtor was insolvent at the time* or the debtor became insolvent as a result of the transfer or obligation.[27]

This language of § 117(A) parallels the constructive fraud provision of § 548(a)(1)(B)(I) and (ii)(I). We conclude that the bankruptcy court applied § 117(A) to the facts of the case, and we will review the findings on insolvency and reasonably

equivalent value under § 117(A) and § 548(a)(1)(B). As the bankruptcy court correctly concluded, the Oklahoma UFTA and § 548 are identical, and cases construing the elements under § 548 are persuasive interpretations for the UFTA.[28] Accordingly, this Court's analysis under § 548 will be equally applicable to both the March Mortgage and the September Mortgage.

*Reasonably Equivalent Value ("REV")*

We have focused our examination of the case law under § 548 on antecedent debt cases, those where the debtor has given security for an antecedent debt. Under § 548, "value" includes the securing of antecedent debt.[29] However, § 548 neither defines "reasonably equivalent value" nor offers guidance for determining whether REV exists.

Our review of the antecedent debt case law suggests that there are two schools of thought on determining whether REV has been given in exchange for a challenged transfer. The first school is exemplified by a line of cases that compare the value of the security or collateral transferred by the debtor to the value of what the debtor received.[30] A corollary

**25.** Section 548(a)(1)(A) is the actual fraud provision.

**26.** Further support for application of § 117 is apparent from the pretrial order where the parties listed as an issue of fact whether there were *present* creditors of the Debtors. *See* Pretrial Order at 5 ¶ IV.9, *in* Appellant's Appendix I at 201.

**27.** Okla. Stat. tit. 24, § 117(A) (emphasis added).

**28.** *See generally* Prefatory Note, Uniform Fraudulent Transfer Act, 7A Part II U.L.A. at 268–71 (1999 Main Vol. West). *See, e.g., In re Image Worldwide, Ltd.*, 139 F.3d 574, 577 (7th Cir.1998); *In re Hemstreet*, 258 B.R. 134, 139 (Bankr.W.D.Pa.2001); *In re Crystal Medical*

*Products, Inc.*, 240 B.R. 290, 300 (Bankr. N.D.Ill.1999).

**29.** 11 U.S.C. § 548(d)(2)(A).

**30.** *See, e.g., In re Countdown of Connecticut, Inc.*, 115 B.R. 18, 21 (Bankr.D.Conn.1990) (the analysis for a fraudulent transfer is directed at what the debtor surrendered and what the debtor received); *In re Reaves*, 8 B.R. 177, 182 (Bankr.D.S.D.1981) (value received by debtor was a mere "fraction" of the $20,000 mortgage given by the debtor for the antecedent debt); *Dayton Title Agency, Inc. v. White Family Companies, Inc. (In re Dayton Title Agency, Inc.)*, 262 B.R. 719, 731 (Bankr. S.D.Ohio 2001) (courts generally compare the value of property transferred with value of that received in exchange for transfer), *rev'd*

line of cases compares the value of the property or security given by the debtor to the amount of the antecedent debt.[31] All of these cases employ a fact-driven analysis to determine whether REV has been exchanged.

A second school of thought favors the application of a per se rule as set out in a line of cases led by *Anand v. National Republic Bank of Chicago (In re Anand)*[32] (*"Anand I"*). *Anand I* holds that, *as a matter of law*, a transfer made to secure an antecedent debt is REV. In adopting this per se rule, the *Anand I* court concluded that collateralizing an antecedent debt "will always be for reasonably equivalent value," regardless of the value of the collateral transferred, reasoning:

> A secured creditor does not own the collateral securing a debt; the creditor has no rights in the collateral except as necessary to protect the claim.... A secured creditor is not entitled to collect more than the amount of the debt from such a liquidation of the collateral. Any

collateral value in excess of the debt is available to satisfy other creditors....

> Nevertheless, there is authority that whether an exchange involving the collateralization of an antecedent debt constitutes the receipt of less than reasonably equivalent value is a question of fact. Under this rule, the value of the collateral is significant to determine whether the debtor received reasonably equivalent value.... This court disagrees and holds that as a matter of law collateralizing an antecedent debt cannot constitute less than reasonably equivalent value regardless of the value of the collateral. This is so, again, because from the perspective of the debtor, the value of the interest in the collateral transferred to the creditor can never be more than the amount of the debt. The value of the collateral is therefore irrelevant to the ultimate question because the excess over the debt is not lost to the debtor or other creditors.[33]

Some courts from other jurisdictions have followed *Anand I*.[34]

---

*on other grounds*, 284 B.R. 238 (S.D.Ohio 2002).

**31.** *See, e.g., In re Mars Stores, Inc.*, 150 B.R. 869, 885 (Bankr.D.Mass.1993) (Section 548 contemplates a comparison of the antecedent debt and the value of the property transferred); *In re Emerson*, 235 B.R. 702, 711 (Bankr.D.N.H.1999) (REV could not be determined on summary judgment where there was a fact issue whether the collateral had value or was worthless); *In re Vaniman Intern., Inc.*, 22 B.R. 166, 185 (Bankr.E.D.N.Y. 1982) (transfer was not for reasonably equivalent value where debtor gave second mortgage of $158,857 to secure antecedent debt of $33,857); *Abraham v. Central Trust Co. (In re Abraham)*, 33 B.R. 963, 968 (Bankr.M.D.Fla. 1983) (To avoid finding of fraudulent transfer where property is transferred as security for antecedent debt it is only necessary to show that the value of the property is not disproportionately large compared to the amount of the antecedent debt); *In re Mason*, 48 B.R. 382, 383–84 (Bankr.M.D.Ala.1984) (mortgage

on house that was worth at least $60,000 given to secure $20,000 antecedent debt was fraudulent transfer).

**32.** 210 B.R. 456 (Bankr.N.D.Ill.1997), *aff'd* 239 B.R. 511 (N.D.Ill.1999).

**33.** *Id.* at 459. Support for the *Anand* per se rule is found in the prefatory notes to the UFTA where it is stated: "The new Act [UFTA], like the Bankruptcy Code, eliminates the provision of the Uniform Fraudulent Conveyance Act that enables a creditor to attack a security transfer on the ground that the value of the property transferred is disproportionate to the debt secured. The premise of the new Act is that the value of the interest transferred for security is measured by and thus corresponds exactly to the debt secured." Prefatory Note, Uniform Fraudulent Transfer Act, 7A Part II U.L.A. at 270 (1999 Main Vol. West).

**34.** *See In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 329 n. 69 (Bankr.S.D.N.Y.2001) (declining to make a quantitative comparison of

We note, as did the bankruptcy court, that on the appeal of *Anand I*, the district court did not totally endorse the per se rule ("*Anand II*").[35] While the district court described the bankruptcy court's reasoning as "persuasive" and "eminently sensible," the district court nonetheless felt compelled by Seventh Circuit Court of Appeals ("Seventh Circuit") precedent to look to the "value" (beyond the loan proceeds) received by the debtor.

But Judge Barliant did not cite, and the court's research did not uncover, any authority that has held that securing an antecedent debt is always a transfer of reasonably equivalent value. Further, such a *per se* rule would represent a departure from the Seventh Circuit's emphasis on "all the facts of each case" as part of the reasonably equivalent value analysis. So, although the court can find no flaws in Judge Barliant's conclusion that Anand received reasonably equivalent value as a matter of law, the court is constrained to consider facts that the bankruptcy court did not.[36]

The district court went on to consider additional evidence in the record that the debtor had received forbearance, an extension of the loan, and waiver of a principal payment and concluded that these counted as "value" received in exchange for the transfer. The district court therefore affirmed the bankruptcy court's determination that debtor received REV.[37]

Against this back-drop, we have found no Tenth Circuit Court of Appeals ("Tenth Circuit") authority interpreting REV under § 548 solely in the context of securing an antecedent debt as was done in this case.[38]

However, *Clark v. Security Pacific Business Credit, Inc. (In re Wes Dor, Inc.)*[39] is most analogous to the fact pattern in the current appeal. There the alleged fraudulent transfer arose in the context of a tripartite relationship and involved a pledge of assets by a debtor subsidiary corporation to secure the antecedent debt of the debtor's parent corporation.[40] The lender made the original operating loan to the parent corporation. The loan was secured by a guarantee from the corporation's president as well as the assets of the parent corporation, which consisted of the stock in the subsidiary corporations. The debtor subsidiary corporation did not initially grant a security interest in its assets. The lender advanced the loan proceeds to the parent, which in turn ultimately funneled them to its subsidiaries through intercompany

---

the amount of the antecedent debt and the value of the collateral at the time of transfer, citing *Anand*); *In re M. Silverman Laces, Inc.*, 2002 WL 31412465, at *6–7 (S.D.N.Y. Oct. 24, 2002) (grant of security interest in debtor's inventory worth two times that of the amount of the debt was REV); *First Nat'l Bank of Seminole v. Hooper*, 104 S.W.3d 83, 86 (Tex.2003) (Finding REV under Texas's UFTA and citing to *Anand* as authority).

**35.** 239 B.R. 511 (N.D.Ill.1999).

**36.** *Id.* at 518.

**37.** *Id.* at 519.

**38.** Two Tenth Circuit cases involve Ponzi schemes and are simply not helpful in analyzing REV in the current case. *See In re M & L Business Machine Co., Inc.*, 84 F.3d 1330 (10th Cir.1996); *In re Hedged–Investments Assoc., Inc.*, 84 F.3d 1286 (10th Cir.1996).

**39.** 996 F.2d 237 (10th Cir.1993).

**40.** In the case at bar, Debtors granted a mortgage to secure their guaranty (the antecedent debt and previously unsecured) of Sabre's debt. Unlike *Anand I* and the other typical "antecedent debt" cases, the Debtors received no loan proceeds. Sabre did. In this respect, this case most closely resembles the fact pattern in *In re Wes Dor, Inc.*

loans.[41] The debtor subsidiary had no direct obligation to the lender. When the debtor's parent encountered financial difficulty, the lender demanded and obtained a pledge of all of the assets of the debtor subsidiary valued at $3.7 million to shore up the outstanding loan to the parent in the amount of $3.7 million. The trustee subsequently attacked the debtor subsidiary's transfer (*i.e.* the grant of a security interest in its assets) to the lender under § 548(a)(1). The lender defended on the basis of § 548(c), arguing that it gave value.

In reviewing the lower courts' determinations that the lender had not given value for the transfer, the Tenth Circuit stated:

> Although this court has not yet had the opportunity to address the standard of review for § 548(c) determinations, at least one authority has noted: "[w]hether the transfer is for 'reasonably equivalent value' [under § 548(a)(2)] in every case is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts." 4 *Collier on Bankruptcy* ¶ 548.09, at 548–112 (15th ed.1993). It follows that the determination of "value" under § 548(c) necessitates the same level of deference afforded to § 548(a)(2) findings.[42]

The Court in *Wes Dor* continued with its analysis of the facts, focusing on what the debtor had received.

> Essential to our analysis is the extent to which the Debtor was obligated to the Bank at the time of the transfer because under § 548(d)(2)(A) "value" includes the securing of an antecedent debt of the debtor....
>
> Although Debtor was a partial beneficiary of the financial relationship between the Bank and [the parent corporation], the benefits it had received by August 5 [the date of the transfer] did not equal the amount of funds extended by the Bank to the parent. Indeed, Debtor directly benefited [sic] only to the extent of the $958,093 in intercorporate debt it had actually received and owed to its parent on August 5.[43]

The Tenth Circuit rejected the lender's contention that it had given value in the form of indirect benefits to the debtor because such indirect benefits were not quantified. The district court's finding of a fraudulent transfer was affirmed and the lender was held liable to the bankruptcy estate for the amount of the transfer [$3.7 million] less the value it had extended to the debtor [$958,093].[44]

Based upon our reading of *Wes Dor* we conclude that if faced with a § 548(a)(1)(B) antecedent debt case like the present case, the Tenth Circuit would examine what the debtor received in exchange for the securing of an antecedent debt to determine REV and would not follow the *Anand I* per se rule.[45] We further note that, in one

---

41. The intercompany loans traceable to the debtor from the parent corporation were in the amount of $958,093. 996 F.2d at 240.

42. 996 F.2d at 242. *See also Zubrod v. Kelsey (In re Kelsey)*, 270 B.R. 776, 779 (10th Cir. BAP 2001) (Whether cash withdrawn by debtor from joint bank account and transferred to his wife was for REV was a question of fact to which considerable latitude must be given to the trier of fact); *In re Image Worldwide, Ltd.*, 139 F.3d at 576 (whether REV was received is question of fact); *Anand II*, 239 B.R. at 517 ("The second inquiry, whether what the debt-

or gave up was reasonably equivalent to what he received, is a slippery one. The Seventh Circuit has emphasized that it requires fact-specific case-by-case analysis.")

43. *Id.* at 242–43.

44. *Id.* at 243.

45. *See also Anand II*, 239 B.R. at 518 (A *per se* rule of REV would represent a departure from the Seventh Circuit's emphasis on examining all the facts of the case to determine

significant respect, the facts of this case are distinguishable from *Anand.* The debtor in *Anand* received the loan proceeds from the original antecedent debt.[46] The *Anand II* court noted that the debtor receives the loan proceeds in the typical antecedent debt case:

> [T]he debtor receives value simply by securing a debt. The collateral makes [t]he loan possible; the value received by the debtor is access to the loan proceeds; ... This value conferred on the debtor is no less significant when the debtor provides security for an antecedent debt, rather than doing so at the time of the original loan transaction. *When one focuses on the fact that the value the debtor receives is the proceeds of the loan itself—even where the debtor collateralizes an antecedent debt—then Judge Barliant's approach is eminently sensible ....* In circumstances such as these the court usually looks to the *other value, beyond the loan,* that the debtor received in conjunction with the transfer.[47]

In the present case, Debtors guaranteed the Bank's loan to Sabre. The Debtors' guaranty, not the loan to Sabre, is the antecedent debt relied upon by the Bank. While it is true that the subsequent mortgage of the Commercial Property by Debtors secured this guaranty of the Sabre debt, Sabre, not the Debtors, received the loan proceeds. We question the soundness of applying the per se rule in those cases where the debtor received no loan proceeds from the antecedent debt and only provides the security for a third party's antecedent debt.

REV); *In re Image Worldwide, Ltd.,* 139 F.3d at 576.

**46.** 210 B.R. at 458.

**47.** 239 B.R. at 517–18 (Emphasis added).

■ This brings us to our review of the record. We assess the evidence to determine the benefit or value received by the Debtors in exchange for what the Debtors gave—the March and September Mortgages. The Commercial Property was valued at $2,000,000. And other than Debtors' 100% stock ownership in Sabre, the equity in the Commercial Property was Debtors' only non-exempt, partially unencumbered asset.[48]

Prior to the March Mortgage, Debtors were indebted to the Bank, by virtue of their guaranty of the Sabre debt, for approximately $8.8 million. The Debtors' guaranty was unsecured. Up to that point in time, Debtors had not received *any* of the $8.8 million. The March restructure resulted in a 30–day $350,000 promissory note *by Sabre* to the Bank. The Debtors executed a new guaranty of this $350,000 note. The Debtors did not receive any funds from the March restructure. The funds were applied to reduce Sabre's loan balance, thereby reducing the Debtors' liability on their original guaranty. But by virtue of the guaranty of the $350,000 note, Debtors remained indebted to the Bank in the full amount of $8.8 million. At best, the March restructure bought Debtors a 30 day reprieve to work out Sabre's financial ills. No quantifiable benefit was received by the Debtors in exchange for the March Mortgage while the Bank gained additional collateral to secure Sabre's and the Debtors' debt. Nothing in the record suggests that Debtors received REV in exchange for the March Mortgage.

**48.** Two prior mortgages against the Commercial Property in favor of Citizens Bank/Gold Bank were approximately $1.37 million. Thus, assuming the Commercial Property was worth $2 million, there was about $600,000 equity in the Commercial Property prior to the March restructure. *See* Note 4, *supra.*

By September 2000, at the time of the second restructure, Sabre and the Debtors were indebted to the Bank for more than $9 million. The Debtors executed a promissory note to the Bank in the amount of $612,721 and granted a mortgage to the Bank on all of the Commercial Property. The "proceeds" from this loan were applied to payoff Sabre's March note in the amount of $350,000 with the balance of the note proceeds being applied to the outstanding balance on the original debt. Again, the Debtors received neither funds nor a credit on *their* guaranty obligation. While the Sabre debt was reduced from $9.4 million down to approximately $8.8, with a corresponding decrease in Debtors' liability on their guaranty, the Debtors became independently liable for the $612,721 by virtue of their execution of the September promissory note. Thus, the Debtors remained indebted to the Bank in the total amount of $9.4 million while the Bank gained additional security for Sabre's and Debtors' debts by virtue of the mortgage encumbering all of the tracts of Commercial Property.[49]

■ At best, the Debtors temporarily received forbearance by the Bank from enforcement of the notes and guaranties and a brief extension of the loans. The value of these benefits has not been quantified.[50] Indeed, at oral argument, the Bank conceded that it relies upon the guaranty debt as its REV for the mortgages. Apart from the purported indirect benefits received by Debtors in the form of salary ($120,000 annually) and monthly rent income from the Commercial Property ($30,000) during this brief period that Sabre continued in operation, there is no evidence in the record quantifying these supposed indirect benefits for the time periods they were received by Debtors. Shortly after the September 2000 restructure, Sabre and the Debtors were in default on Sabre's $8.8 million indebtedness. The bankruptcy court's conclusion that Debtors did not receive REV for the September Mortgage is substantially supported by the record.[51]

*Insolvency*

■ For avoidance of transfer purposes, the test of insolvency under the Bankruptcy Code and the UFTA is the "balance sheet" test (*i.e.* liabilities greater than assets at fair valuation).[52] The Bank argues that the Trustee and the bankruptcy court, by relying on Sabre's financial statements at the time of the transfers, did not value Debtors' assets at "fair valuation" as required by the statutes.[53] In particular, the

---

**49.** Assuming the value of the Commercial Property was $2 million and the prior liens of Gold Bank were $1.37 million, the Debtors secured their indebtedness and Sabre's with an additional $600,000 of equity in the Commercial Property.

**50.** Indirect benefits that cannot be quantified do not constitute value. *See In re Wes Dor, Inc.*, 996 F.2d at 243; *In re Kelsey*, 270 B.R. at 781–82.

**51.** Nowhere in the record is it stated that *any* of the loan proceeds were received, directly or indirectly, by the Debtors in exchange for the mortgages, further justifying the bankruptcy court's order avoiding the March and September Mortgages. *Cf. In re Wes Dor,*

*Inc.*, 996 F.2d at 243 (The lender, as the transferee of the security interest, was liable to the bankruptcy estate for the value of the pledged assets ($3.7 million) *less* the amount of the intercompany loans received by the debtor ($958,093) and traceable to the lender's financing provided to the parent.). *See also* 11 U.S.C. § 548(c).

**52.** *Cf.* 11 U.S.C. § 101(32)(A) and Okla. Stat. tit. 24, § 114(A). *See also* Okla. Stat. tit. 24, § 114(B), which contains a presumption of insolvency where the debtor is not paying his debts as they become due.

**53.** The Bank argues that Sabre's financial statements, prepared under Generally Accepted Accounting Principles ("GAAP") and re-

Bank takes issue with the bankruptcy court's conclusion that Debtors' stock in Sabre was worthless, contending that the stock in Sabre was worth $1.7 to $2.2 million as of June 30, 2000, according to Debtors' testimony. The Bank also challenges the inclusion of the Debtors' Sabre guaranty on the liability side of the equation.

The Trustee counters that in evaluating the balance sheet test of insolvency only those assets capable of liquidation should be considered. The Trustee contends that this consists of Debtors' stock ownership in Sabre and the Commercial Property. The Commercial Property was partially encumbered by the prior Gold Bank mortgages and the remaining equity in the Commercial Property was estimated at $600,000 at most.

We have reviewed the financial data in the record as well as the Debtors' trial testimony. We conclude that the bankruptcy court did not err on the issue of insolvency. The bankruptcy court con-

structed a "balance sheet" of Debtors' assets and liabilities, focusing on non-exempt and unencumbered assets that would be susceptible to liquidation.[54] It also properly included Debtors' obligation to the Bank on their guaranty of the Sabre debt on the liability side of the balance sheet.[55]

Even without consideration of Sabre's GAAP financial statements showing a $1.5 million deficit in stockholders' equity, the Debtors' financial condition supports a finding of insolvency. Debtors' financial position as of March 31, 2000, showed assets of $2,947,900 and liabilities of $10,823,000. Debtors valued the Commercial Property at $2,100,000 and their Sabre stock at $0. They carried their Sabre guaranty obligation to the Bank at $7,000,000 and liability to Gold Bank at $1,400,000. James Solomon testified that there was no significant improvement in Debtors' financial condition subsequent to March 31, 2000, and that the March 31, 2000, balance sheet accurately reflected their financial condition.[56] We note that his testimony at

flecting negative retained earnings, did not record assets at fair market value.

**54.** *See* 5 *Collier on Bankruptcy* ¶ 548.05[1][a], at 548–32–34 (15th rev. ed.2003); *Bay State Milling Company v. Martin (In re Martin)*, 145 B.R. 933, 947 (Bankr.N.D.Ill.1992), *appeal dismissed*, 151 B.R. 154 (N.D.Ill.1993). (Insolvency is determined from the creditor's perspective by examining what assets are available and the value that could be realized for payment of debts.); *Briden v. Foley*, 776 F.2d 379, 382 (1st Cir.1985) (Asset valuation need not be exact but should be reduced by value of assets not readily susceptible to liquidation and payment of debts). On the asset side, the bankruptcy court properly considered only those assets that were not exempt and were subject to liquidation by creditors. The assets of any substance were the Sabre stock and the partially encumbered Commercial Property. The Bank does not contend that the bankruptcy court failed to include certain assets in the creation of the balance sheet but merely takes issue with the value placed on the Sabre stock.

**55.** *See In re Martin*, 145 B.R. at 949. (Guarantees of corporate debt could be included in determining insolvency if debtor would likely be called upon to honor the guarantees.); *Grigsby v. Carmell (In re Apex Warehouse, L.P.)*, 238 B.R. 758, 771 (Bankr.N.D.Ill.1999) (Contingent assets and liabilities must be reduced to present value for determining whether debtor is insolvent and must determine the likelihood that the contingency will occur.). Here, Debtors unconditionally guaranteed the Sabre debt and there was no evidence that the Bank would forego collection or enforcement from Debtors. In short, the Debtors' liability under the guaranty was not contingent.

**56.** Trial Transcript at 137–138, 142–143, *in* Appellant's Appendix II at 357–58, 362–63. Also, according to Debtors' personal financial statement as of June 30, 2000, the value of the Commercial Property remained at $2.1 million while the value of their Sabre stock was $1.7 million. However, this personal financial statement omitted the Debtors' guaranty

trial concerning the purported $2 million value of the Sabre stock conflicts with Debtors' financial statement as of March 31, 2000, but conclude that the bankruptcy court refused to give credence to Debtor's inconsistent testimony. This is well within the bankruptcy court's prerogative as the trier of fact. Because the bankruptcy court, and not this Court, is in the best position to gauge the credibility of witnesses, we do not disturb factual findings that find support in the record.

Moreover, even if the bankruptcy court had accepted the Debtor's testimony that the Sabre stock was worth $2 million, their liabilities still exceeded their assets, at fair valuation, at the time of the transfers as shown by the "balance sheet" constructed below.

As of March 31, 2000:

| | | |
|---|---|---|
| *Assets* | | |
| Commercial Property | $ 700,000 | ($2.1 million less Gold Bank mortgages of $1.4 million) |
| Sabre Stock | $ 2,000,000 | |
| | $ 2,700,000 | |
| *Liabilities* | | |
| Other unsecured debt | $ 2,000,000 | (admitted debt as of March 2000) |
| Stillwater Bank | $ 8,800,000 | (amount of guaranty prior to March mortgage) |
| | $10,800,000 | |
| *Net Worth* | ($8,100,000) | |

As of September 29, 2000:

| | | |
|---|---|---|
| *Assets* | | |
| Commercial Property | $ 500,000 | ($2.1 million less Gold Bank mortgages of $1.6 million) |
| Sabre Stock | $ 1,700,000 | |
| | $ 2,200,000 | |
| *Liabilities* | | |
| Other unsecured debt | $ 2,000,000 | |
| Stillwater Bank | $ 9,000,000 | (amount of guaranty prior to September mortgage) |
| | $11,000,000 | |
| *Net Worth* | ($8,800,000) | |

We therefore conclude that the bankruptcy court's finding that Debtors were insolvent at the time of the March Mortgage and September Mortgage is amply supported in the record.

### Conclusion

Because the bankruptcy court's findings of fact concerning receipt of REV and insolvency are not clearly erroneous and because its conclusions of law, considered de novo, are consistent with what this Court believes the Tenth Circuit would hold based upon its prior holdings in *Wes Dor*, we AFFIRM the order of the bankruptcy court avoiding the March and September Mortgages as constructively fraudulent transfers.

of the nearly $9 million Sabre debt to the Bank as a liability. *See* Trial Exhibit, *in* Appellant's Appendix II at 439.